Dorothy FRANCOEUR, Plaintiff,

v.

CORROON & BLACK CO., Defendant.

No. 82 Civ. 7098.

United States District Court,
S.D. New York.

Dec. 10, 1982.

Janice Goodman, New York City, for plaintiff.

Wexler & Burkhart, P.C., New York City, for defendant; Stephen B. Wexler, David Hirschberg, New York City, of counsel.

## OPINION

SAND, District Judge.

This controversy first came before the Court when, by order to show cause filed October 26, 1982, plaintiff sought a preliminary injunction restoring her to the position of personnel manager/office administrator with defendant ("C & B"), an insurance brokerage concern.

On September 16, 1982 plaintiff, then in defendant's employ, filed a charge of sex discrimination with the United States Equal Employment Opportunity Commission (EEOC), alleging that her employer was violating Title VII by paying her less than her male predecessor, and by engaging in a pattern and practice of sex discrimination.

On October 19, 1982 plaintiff was discharged from employment effective imme-

diately, and on October 25, 1982 plaintiff filed a charge with the EEOC alleging that her termination was in retaliation for her earlier filing.

On October 26, 1982 plaintiff filed a complaint in this Court alleging retaliation in violation of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq. as amended in 1972 (Title VII), and simultaneously brought on the aforesaid order to show cause why a preliminary injunction should not issue restoring her to her position of employment with the defendants should not issue.

A hearing on plaintiff's request for interim relief commenced on October 29, 1982 at which time the plaintiff testified.

At the Court's suggestion and with the consent of the parties, the proceeding was adjourned until November 22, 1982 for a full trial on the merits of plaintiff's equal pay and retaliation claims. On November 4, 1982, at the request of the parties, the EEOC issued the requisite right to sue letter covering all charges.

Plaintiff thereafter amended her complaint to allege that defendant wilfully and intentionally denied her equal pay in violation of both the Fair Labor Standards Act, 29 U.S.C. Section 206(d) ("Equal Pay Act"), and Title VII and that the defendant fired her in retaliation for asserting her civil rights in violation of Title VII.

The case was tried by the Court on November 22–25. The following constitutes the Court's findings of facts and conclusions of law pursuant to Fed.R.Civ.Proc. 52(a). Plaintiff's testimony at the preliminary injunction hearing has been deemed part of the trial record pursuant to Fed.R.Civ.Proc. 65(a)(2).

### I. Equal Pay Claim

A. Facts

1. Russin's Hiring and Employment

During the latter part of 1977 John A. Corroon, vice president of defendant, was hospitalized and away from work for approximately five weeks. During his ab-

sence senior management interviewed and hired someone to fill a newly created post designed to relieve Corroon of some of the burdens that he had previously been carrying and which were believed to have contributed to his medical problems. He testified, for example, that prior to his hospitalization he had personally attended to details of office administration as minute as reading copy machine meters.

The individual hired during Corroon's absence withdrew from consideration upon Corroon's return, and an executive recruiter, Robert Murphy, was enlisted to find a replacement. Corroon testified that he had requested from Murphy someone with college training and experience relating to copying equipment, communications and relocation. Murphy referred Edward Russin, who was hired at the same salary as had been set for the individual who had withdrawn, $29,000 per annum.

Russin's experience at the time he was hired by C & B included two and one half years of college. Immediately prior to his hiring by defendant he was employed by A.G. Becker & Co. ("Becker"), a brokerage concern, where he rose from the position of assistant to the assistant operations officer to that of assistant vice president. He resigned from Becker shortly after that company was acquired by a French bank.

At Becker, Russin was heavily involved in office relocation. He testified that there was, on the average, one relocation a month and that for a period of two years he planned a relocation of 650 of Becker's employees.

He characterized his experience in personnel matters as light, as contrasted with what he termed his heavy experience in office administration.

He further testified that when Murphy initially communicated with him about the position at C & B, he was told that the company needed someone strong in office administration who could be trained in personnel matters.

At a hiring interview Corroon told Russin that he would be expected over time to "get involved" with procedures relating to personnel.

It is clear, however, that in the course of his employment at C & B Russin's involvement with personnel matters was limited and that he remained primarily concerned with office administration and equipment. Although he supervised the mail-room, switchboard and word-processing personnel, and conducted initial hiring interviews for clerical personnel, he was not involved with recruitment, hiring or supervision of employees at any higher level.

Russin's other duties at C & B, as described by both Russin and Corroon, included the purchase of furniture, fixtures and office supplies, establishing an inventory control system, replacing the telex equipment, engaging a new telephone maintenance company, evaluating C & B's need for a word processing system and the various systems available and ultimately participating in the selection of one such system.

Moreover, Russin made extensive use of his office relocation experience. Approximately one year after Russin's hiring, defendant's parent corporation relocated from the 15th floor of 115 William Street in Manhattan, which had been shared with the defendant until that time. Russin acted as a consultant of sorts to those employees of the parent charged with the relocation responsibility and played a role in the subsequent expansion of defendant's offices into the vacated space on the 15th floor.

While the evidence is equivocal with respect to the extent to which Russin's relocation experience was discussed at the time of his hiring and whether defendant was aware at that time of its parent's upcoming move, it is clear that Russin did function to a significant degree in connection with the relocation of defendant and its parent.

Although a causal relation was not made explicit at trial, we note that Russin's employment at C & B was terminated effective December 31, 1979 when the move was virtually completed.

## 2. Plaintiff's Hiring and Employment

Defendant initially intended not to hire anyone upon Russin's termination. Corroon was to take over office management and rely for support on the parent corporation to a greater extent than previously.

In early 1980, however, defendant decided to hire an additional employee and defendant once again sought the services of Robert Murphy, the executive recruiter. Contemporaneous C & B internal memoranda regarding the position make reference to a "replacement" for Russin.

Corroon testified, however, that it was not defendant's intention to hire someone who would perform the same duties performed by Russin, but rather an individual who would be primarily involved in personnel matters.

In February 1980, upon referral by Murphy, Corroon interviewed plaintiff, who was ultimately hired at a salary of $23,000 per annum—a salary within the range suggested by Murphy.

Plaintiff's work experience immediately prior to her hiring by defendant was a five-year period of employment with American Airlines, where she started as a clerk and rose to the position of office supervisor. Her formal educational background consists of high school and personnel-related courses that she has attended from time to time.

Like Russin, plaintiff was responsible at C & B for the supervision of back office personnel and inventory control. Plaintiff also testified, however, as to her considerable activities with respect to personnel matters. Such matters included designing and implementing attendance and punctuality programs, conducting hiring and exit interviews for all of defendant's nonexempt employees and establishing and conducting tests for all such personnel.

Her most recent resume, prepared prior to any indication of the development of the instant dispute, strongly attests to the primarily personnel-related nature of plaintiff's position at C & B.

The relevant portion of this resume reads as follows:

"Manager—Personnel/Office Administration—Implemented uniform recruitment and hiring procedures, recruitment, testing, interviewing and hiring of all nonexempt employees. Implemented and conducted structured employee orientation programs. Designed and administered personnel policy manual. Designed and conducted training seminars for all employees. Designed and implemented personnel record system and various personnel data forms. Expanded usage of word processing system to include personnel control data forms. Processed medical claim forms for all employees. Implemented and monitored inventory control procedures for purchasing of office supplies, printed forms and equipment. Monitored functions of mail services, word processing and reception areas." Plaintiff's Exhibit 1, at 1.

It is undisputed that throughout the term of her employment at C & B plaintiff was compensated at a lesser rate than was Russin. Their respective annual salaries are set forth in the margin.[1]

## B. Prima Facie Case under the EPA

■ To establish a prima facie case under the Equal Pay Act, plaintiff must show that

---

1. Dorothy Francoeur                    Edward Russin

| Date | Increase | Salary | Date | Increase | Salary |
| --- | --- | --- | --- | --- | --- |
| 3/3/80 | At hire | $23,000 | 11/7/77 | At hire | $29,000 |
| 7/1/80 | | $24,000 | 7/1/78 | | $31,000 |
| 1/1/81 | | $26,000 | 7/1/79 | | $32,500 |
| 7/1/81 | | $28,500 | | | |
| 7/1/82 | | $31,000 | | | |

the employer "pays different wages to employees of the opposite sex 'for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974), quoting Equal Pay Act Section 3, added to the Fair Labor Standards Act of 1938 Section 6, 29 U.S.C., Section 206(d)(1).

■ Plaintiff need not show that the two jobs are identical. *Marshall v. Building Maintenance Corp.,* 587 F.2d 567 (2d Cir. 1978); *Odomes v. Nucare, Inc.,* 653 F.2d 246 (6th Cir.1981). By the same token, however, plaintiff cannot show merely that two jobs are comparable and that the wage differential between them is unjustified by the comparable worth of each job to the employer. See *Hodgson v. Corning Glass,* 474 F.2d 226, 231 (2d Cir.1973), affirmed 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).[2] Plaintiff must prove a "substantial equality of skills, effort, responsibility and working conditions" between the two jobs. *Odomes v. Nucare, Inc.,* supra, 653 F.2d at 250 (citing *Shultz v. Wheaton Glass Co.,* 421 F.2d 259 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970)).

■ We find that plaintiff has not borne her burden of showing substantial equality between the job she performed while employed by defendant as personnel manager/office administrator from March 3, 1980 until October 19, 1982, and the job performed by Edward Russin, defendant's office manager for the period November 7, 1977 to December 31, 1979.

In reaching this conclusion we find that despite several respects in which the services performed by plaintiff were similar to those performed by Russin and despite defendant's reference to the position that

plaintiff assumed as a replacement for Russin, the two jobs were significantly different.

Russin and plaintiff each possessed, were hired for and brought to bear on their jobs considerably different skills and backgrounds.

Russin was primarily an office administrator and supervisor whose background and involvement in personnel was subsidiary. With respect to plaintiff, the converse was the case.

The reason for the shifting nature of the position is clear: By the time Russin was terminated, Corroon had overcome the medical problem that had necessitated Russin's hiring, and Corroon's ability once again to function as a corporate vice president had by then been demonstrated. The relocation of defendant's parent and defendant's internal expansion into the 15th floor had taken place. Word processing, telex, and other equipment had been purchased.

In short, by early 1980 defendant's needs in the nature of an assistant to Corroon had changed significantly from what they were when Russin was hired in 1977. It was only in a very loose sense—namely that plaintiff would, like Russin, be Corroon's assistant— that she was referred to as Russin's replacement.

Because plaintiff has failed to prove that she was performing a job substantially similar to that performed by Russin, her claim for relief under the Equal Pay Act must be denied.

## II. Title VII Claim

■ In addition to her claim under the Equal Pay Act plaintiff alleges that defendant violated Title VII, 42 U.S.C. Section 2000e et seq., by denying plaintiff "the salary commensurate with her position and the

---

**2.** The fact that the jobs being considered equal were not in this instance held simultaneously, but rather were held in immediate or near immediate succession does not preclude a determination of "equal work". *Pearce v. Wichita County,* 590 F.2d 128, 133 (5th Cir.1979); *Peltier v. City of Fargo,* 533 F.2d 374, 377 (8th Cir.1976); *Hodgson v. Behrens Drug Co.,* 475

F.2d 1041, 1049 (5th Cir.1973). In *Behrens Drug,* supra, the Court noted the Act's legislative history's reliance on War Labor Board experience with regard to that agency's equal pay policy, a consistent element of which was to ensure that women hired to replace men as a result of manpower shortages were paid the same rate as their predecessors. Id. at n. 11.

terms and conditions of employment commensurate with those offered similarly situated men."

To the extent that this claim overlaps with her equal pay claim, our above discussion requires that it be denied. To the extent that her Title VII claim does not rest on a determination that Russin performed equal or substantially equal work (as indeed her claim need not so rest, see *County of Washington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), we conclude that plaintiff has not borne her burden of proving by a preponderance of the evidence, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), that defendant's asserted reasons for the pay disparity between Russin and plaintiff were pretextual.

Given the differing natures of their jobs, plaintiff has failed to adduce sufficient evidence, of either an objective or subjective form, that would permit a finding that her salary was based even in part on her sex.

Compare *Gunther,* supra, where the Supreme Court held that a prima facie case was made out by evidence that defendant had estimated the worth of two positions and had determined that the position held by females should be compensated at a rate approximately 95 percent of that set for the male position; the employer, however, paid the women only about 70 percent of what it paid the men.

Accordingly, plaintiff's claim that she suffered sex-based wage discrimination in violation of Title VII is denied. Further, she has introduced no evidence to support a finding that defendant has engaged in a pattern and practice of sex discrimination and her Title VII claim premised on such an allegation is also denied.

### III. Retaliatory Firing

It is plaintiff's contention that her termination on October 19, 1982 was in retaliation for her Title VII filing with the EEOC on September 16, 1982.

Defendant on the other hand asserts that plaintiff was fired because she exercised extremely poor judgment in connection with the termination of a mail room employee as a result of which plaintiff's effectiveness as a manager was fatally undermined.

### A. Plaintiff's Work Performance and Termination

Prior to the incidents giving rise to this lawsuit, plaintiff's work record apparently was substantially unblemished. Her performance at C & B was evaluated in accordance with defendant's established policy of reviewing its employees once a year. The three reviews she received from her superiors were all positive, and at times effusively so. They contained such praise as: "Quality of work is superior"; "(has) created an atmosphere of cooperation between her department and others"; "has shown good initiative from day one"; and "put the (personnel) department on a professional basis".

No evidence was presented of any negative reviews of plaintiff's work either written or oral prior to her EEOC filing.

Plaintiff's salary increases over two and one half years of employment totaling over $8,000 similarly attest to defendant's satisfaction with her work. In addition, plaintiff testified, and the Court finds, that prior to her filing of the EEOC charge, she enjoyed a good, free-flowing and easy working relationship with defendant's senior management, most notably with Corroon, her immediate supervisor.

Plaintiff first raised with Corroon the question of a possible equal pay claim prior to his leaving for vacation. Plaintiff advised Corroon that he would be receiving a letter from plaintiff concerning her contention that Russin, whose salary she had only recently discovered, was paid a significantly higher salary than she.

After plaintiff filed her EEOC charge, her attorney was in contact with the defendant by letter dated September 24 in an attempt to obtain an informal resolution of the charge. Defendant's response resulted in the arranging of a meeting between plaintiff's counsel and defendant for October 18th.

Allen Blomquist was employed as a mail-room clerk. His work history included significant periods of absence and consistent unpunctuality. Charged with the responsibility of overseeing the punctuality and attendance of the defendant's employees, plaintiff and Corroon had from time to time discussed Blomquist and the manner in which his lapses should be handled. Sometime in either August or September 1982 Blomquist was given what was termed a final warning.

On October 6, 1982 Blomquist was again absent from work. Because Corroon was away on vacation, plaintiff met with Edward Sweeney, defendant's president, to discuss what action to take with regard to Blomquist.

Sweeney suggested and plaintiff agreed that Blomquist should be put on probation for 30 days during which time his attendance and punctuality would be closely observed. Plaintiff advised Blomquist of this decision and, according to Blomquist's testimony, stated to him that even if he were at "death's door" he would have to report to work. Because Blomquist had another job offer at the time of this conversation, he told plaintiff that he thought it would be best for him to resign and thereupon gave one week's notice to that effect.

Friday, October 15th, was Blomquist's last day of employment. On the day before, in accordance with company tradition, he was taken to lunch by eight fellow employees. This lunch extended from noon until 3:45 p.m.

Apparently plaintiff was unaware that this luncheon was taking place and her prior approval had not been sought or obtained. The next day Blomquist was one-and-one-quarter hour late for work, having called his superior that morning to tell him that he wasn't feeling well and would be late.

When Blomquist arrived, he reported to plaintiff's office where he explained he was late because he was ill. Convinced that in light of Blomquist's work record, including the previous day's nearly four-hour lunch, little benefit could be obtained by having

Blomquist spend the remainder of the day in the office, plaintiff asked him to leave the premises immediately. He responded that he wanted to say goodbye to his friends, thank them for the previous day's lunch, and leave them a thank you card in defendant's 14th floor coffee room.

He then left plaintiff's office and went into the mail room. A half hour later Blomquist, having been by this time asked to leave by plaintiff several times, was still in the mail room.

Plaintiff's further request that he leave evoked from him, plaintiff testified (and having observed the demeanor of both plaintiff and Blomquist, the Court finds as a matter of fact to have occurred), personally abusive and threatening remarks such as "See you later, Baby," or "See you outside, Baby".

When it appeared to plaintiff that her attempts to get him to leave would be fruitless, she went back to her office and called Sweeney for assistance, but he was unavailable.

She then telephoned the building security force to have Blomquist escorted from the premises. Prior to the arrival of any security guard, however, Blomquist departed.

On Monday, October 18, Corroon returned from vacation. That same day plaintiff's counsel met with defendant pursuant to their prior arrangement in late September. Their efforts to resolve informally plaintiff's equal pay claim proved unavailing.

On Tuesday, October 19th at 4 p.m., plaintiff was called into Sweeney's office and told that she was being terminated effective immediately. She was instructed to pack her personal belongings and leave the premises immediately.

The reason given for the firing was simply "performance", and plaintiff's request for any further explanation elicited no details. Corroon accompanied her back to her office and stood in the doorway while she packed, and then escorted her out the door.

Corroon testified that he reached the decision to terminate the Plaintiff on the eve-

ning of Monday, October 18th, in the course of a car ride home with James Corroon, defendant's chairman, and Mr. Black, president of defendant's parent corporation. Corroon testified that the sole reason for plaintiff's termination was her treatment of Blomquist, the details of which had been related to him in a weekend telephone conversation with his secretary, who had herself been absent from the office on the day of the incident.

Sweeney, on the other hand, testified at trial that he alone had reached the decision to terminate plaintiff on the morning of October 18th on the basis of the Blomquist incident as well as several other matters that he felt indicated plaintiff's poor work performance.

Sweeney's knowledge of what had transpired on October 15th between plaintiff and Blomquist was derived from a discussion with an employee who was told what happened by Blomquist and from an anonymous letter by an employee who had been told of the incident and who wanted to protest the "high-handed" manner in which plaintiff had forced Blomquist from the premises.

Both Corroon and Sweeney testified that they had consulted with in-house counsel and that the only extent to which plaintiff's filing of an EEOC charge entered into the decision was an awareness that the termination would be alleged to be retaliatory.

### B. Discussion

■ To make out a prima facie case of retaliatory dismissal under Section 704(a) of Title VII, 42 U.S.C. Section 2000e-3(a), plaintiff need show, first, that she opposed an employer's allegedly unlawful practice under Title VII, and the employer was aware of this opposition; second, that she suffered a disadvantaging employment decision; and third, there existed a causal relationship between the two. See *EEOC v. Local 14 and 15*, 438 F.Supp. 876, 881 (S.D.N.Y.1977).

■ All three elements are clearly present in the instant case. Plaintiff filed an EEOC charge on September 16 of which defendant was aware as of September 24. The short interval between that date and her termination on October 19, an interval during some of which time her immediate superior, John Corroon, was away on vacation, in itself creates a inference of retaliation and serves to establish a prima facie case under section 704(a).

Accordingly, defendant bears the burden of raising a genuine issue of fact as to its motivation, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) and it must articulate a legitimate non-discriminatory purpose underlying the termination decision.

In this regard, the Court finds entirely incredible the testimony of defendant's executives relating to their reasons for terminating plaintiff.

Defendant's assertion that plaintiff's overall prior performance was unsatisfactory is irreconcilable with the reviews and merit salary increases she consistently received. Sweeney's summoning up at trial of instances, such as the time when the Plaintiff failed to respond to his telephone call as rapidly as he would have liked, appears in fact an attempt to rely on relatively trivial and long forgotten incidents rather than on factors significant to a determination of plaintiff's overall efficiency and performance.

Moreover, defendant's asserted reliance on plaintiff's allegedly poor handling of the Blomquist incident is similarly unavailing.

The single most salient factor leading the Court to conclude that plaintiff's dismissal was motivated by discriminatory animus and that defendant's reliance on the Blomquist incident is merely pretextual is the failure of any of the defendant's executives to interview plaintiff or attempt in any fashion to obtain her version of what transpired.

Even though plaintiff's attorney had met with defendant's representatives on October 18th, the day immediately prior to her termination, and the day both Corroon and

Sweeney state they made their decision, the matter was not touched upon at that time.

No effort was made by Messrs. Corroon, Sweeney or Black to discover from plaintiff whether Blomquist had been threatening, abusive, disruptive or in any manner deserving of the treatment to which plaintiff allegedly subjected him.

Blomquist's less than unblemished work record, of which both at least Sweeney and Corroon were aware, makes this inaction inexplicable, especially when that record is contrasted with plaintiff's virtually spotless work history. In short there was a complete, and somewhat hurried, readiness on the part of defendant's senior management to accept the version of events furnished by office gossip, hearsay and an anonymous letter writer and a total abandonment of any attempt to get plaintiff's account.

We agree with defendant that the issue here is not whether in hindsight defendant's executives acted with good judgment in terminating the plaintiff or, put in another way, whether plaintiff's action warranted her dismissal. See, e.g., *Jefferies v. Harris County Community Action Association,* 615 F.2d 1025, 1036 (5th Cir.1980); cf. *Loeb v. Textron,* 600 F.2d 1003, 1012 n. 6 (1st Cir. 1979) (age discrimination).

Rather, the issue is whether defendant's concededly precipitously arrived at decision to terminate plaintiff was caused by her EEOC filing. The Court finds that it was so caused.

The decision of defendant's management to terminate plaintiff in the manner they did represents not only unfairness and poor judgment, as defendant's executives now concede, but more significantly, a determination on the part of defendant's senior executives that they could not tolerate plaintiff continuing as defendant's personnel manager during the considerable period that the resolution of a sex discrimination in sex employment charge usually requires.

There is simply no other reason why an employer, acting after having consulted with counsel, would not make any effort to ascertain from its personnel manager whether a situation had arisen for which company policy demanded that the personnel manager be supported by management. Perhaps after investigation management might have concluded that regardless of the merits of the Blomquist incident, that incident had destroyed plaintiff's effectiveness as a personnel manager, but surely an employer not acting with animus would have sought to ascertain the facts from the only direct witness who could have furnished a first hand account of what Blomquist had said to the plaintiff, other of course than Blomquist himself, and that is the version of the plaintiff herself.

Even if plaintiff's usefulness as a personnel manager may have ended, the terms and conditions of her departure from the company would, one supposes, have been affected by what, after even the most cursory investigation, it had been determined had occurred.

One of defendant's witnesses testified that they felt that there was no need to talk to the plaintiff concerning the Blomquist incident because it was felt that they "had enough."

We find that what occurred here is that a determination had been made by defendant to terminate plaintiff because of her EEOC filing, an action attributed to plaintiff's overall performance and the Blomquist incident, with respect to which senior management did not wish in any way to compromise or to confuse its decision by the most obvious and superficial effort to obtain the facts.

Accordingly, the Court finds that the defendant terminated plaintiff in retaliation for her filing a sex discrimination charge with the EEOC and in violation of section 704(a) of Title VII.

Although not raised or argued by either of the parties, we have considered the question whether an exception exists to the prohibition against retaliatory discharge where the filing of a charge of discrimination by an employee occupying a highly sensitive post indicates such an animus toward senior management or lack of rapport with other employees or lack of judgment

or mental stability, that termination of such an individual's employment because of the filing of the charge is permissible.

It is clear that "not all 'opposition' activity is protected under section 704(a)," *Jefferies v. Harris County Community Action Association,* 615 F.2d 1025, 1036 (5th Cir.1980), cf. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 803, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1972).

Courts have recognized the need to balance the employer's interest in the smooth functioning of its business against an employee's interest in resolving discrimination claims, most notably in instances where the employee exercises especially forceful opposition. See *Hochstadt v. Worcester Foundation,* 545 F.2d 222, 230 (1st Cir.1976).

In the absence of legislative guidance as to the precise contours of "protected activity" under Section 704(a), the cases have produced two complementary standards: First, an employee seeking the protection of that section may be called upon to demonstrate a good faith, reasonable belief that the underlying challenged employment exists and violates Title VII, see, e.g., *Parker v. Baltimore & Ohio Railroad,* 652 F.2d 1012, 1020 (D.C.Cir.1981); *Sias v. City Demonstration Agency,* 588 F.2d 692 (9th Cir. 1978); *Monteiro v. Poole Silver Co.,* 615 F.2d 4, 7 (1st Cir.1981).

Second, the manner of the employee's opposition must be reasonable, as determined on a case by case basis, by balancing the purposes of Title VII, and the need to protect individuals asserting rights thereunder, against an employer's legitimate demands for loyalty, cooperativeness and a generally productive work environment. See, e.g., *Hochstadt v. Worcester Foundation,* supra; *Pendleton v. Rumsfeld,* 628 F.2d 102 (D.C.Cir.1980).

Applying these standards in the instant case, we find that plaintiff acted in good faith and with a reasonable belief that her charge raised valid claims under Title VII.

After discovering an apparent sex based pay disparity she approached her immediate supervisor for an explanation. Finding his response inadequate, she filed an EEOC charge under the advice of counsel.

No indication was given at trial of anything but circumspect behavior on the part of plaintiff. Her actions were taken with apparent regard for defendant's need to maintain smooth operations. Overall we find her conduct wholly reasonable and taken in good faith, although we are denying on the merits her equal pay claim.

We find nothing in plaintiff's behavior suggestive of conduct that would support the invocation of the principles articulated in the above cited authorities.

Moreover, while we recognize that the increased prominence or sensitivity of a particular employment position may constrain the scope of opposition behavior deemed protected activity, see *Pendleton v. Rumsfeld,* supra, it appears clear from the statute itself that there exists no position for which an EEOC filing in itself may constitute unprotected activity. See *Hochstadt v. Worcester Foundation,* supra, 545 F.2d at 230, 231.

In any event, we find nothing in the nature of plaintiff's position, the charge filed by plaintiff, her attitude toward senior management as reflected in the charge or in the manner in which she informed her superiors of the action she had taken, which would permit the employer to discharge her because of her EEOC filing.

**C. Remedy**

■ The most troublesome aspect of this case relates to the matter of remedy. Plaintiff seeks in the first instance reinstatement to the position of defendant's personnel manager/office administrator. It is plaintiff's assertion, although put forth with diminishing enthusiasm as this litigation progressed and the acrimony between the parties became more manifest, that reinstatement would be feasible.

Defendant contends that the position of personnel manager is an extremely sensitive one, that the person occupying that position must be able to maintain a close working relationship with other members of

management, and that plaintiff's relationship with defendant's executives has deteriorated to the point where reinstatement is impractical.

We are mindful that the granting of reinstatement generally vindicates the purposes of Title VII and its prohibition against retaliatory firing. Like an award of back pay, reinstatement serves the "make whole" purpose of Title VII, see *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), and prevents an employer from ridding itself, "at any cost", of an employee who asserts rights under the statute.

Moreover, reinstatement undercuts an employer's attempt to "chill" the assertion of rights by other employees who believe themselves victims of unlawful discrimination.

In light of this we note our concern whether under the circumstances of this case any remedy other than reinstatement would effectively vindicate the statute. In addition to the above-stated finding that defendant's senior management made a conscious determination that it would fire plaintiff and risk the consequences, the evidence adduced at trial indicates that other female employees felt that they were victims of discrimination but had not filed EEOC charges and that the defendant was aware of their dissatisfaction prior to terminating plaintiff, defendant's personnel manager.

Nevertheless, on balance, the Court concludes that reinstatement is not a feasible remedy here. Plaintiff's former position as personnel manager is indeed a sensitive one that can be effectively performed only by somebody who enjoys a close, confidential working relationship with management and is able to and trusted to act as management's representative and spokesperson.

It is clear that the present relationship between plaintiff and defendant's senior management is such that a restoration to its prior state cannot be readily contemplated.

A finding of retaliatory firing does not require a Court to order reinstatement. See *St. John v. Employment Development Agency,* 642 F.2d 273, 275 (9th Cir.1981); Section 706(g) makes explicit the discretionary nature of the appropriate remedy to be granted in a given context. See *Taylor v. Teletype Corp.,* 648 F.2d 1129 (8th Cir.1981); *Sias v. City Development Demonstration Agency,* 588 F.2d 692 (9th Cir.1978).

We are of the opinion that to order reinstatement here would be to unduly hinder defendant's operations and would create a substantial likelihood of future litigation, see *EEOC v. Kallir, Phillips, Ross, Inc.,* 420 F.Supp. 919 (S.D.N.Y.1976), affirmed mem., 559 F.2d 1203 (2d Cir.), cert. denied, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977); *Hyland v. Kenner Prods.,* 11 F.E.P., Paragraph 10,926 (S.D.Ohio 1976).

The common alternative to reinstatement is an award of "front pay", based on reasonably anticipated future losses of salary caused by unlawful discrimination. E.g., *Kallir, Phillips,* supra; *Fitzgerald v. Sirloin Stockade,* 624 F.2d 945 (10th Cir.1980); *Patterson v. American Tobacco Co.,* 535 F.2d 257 (4th Cir.), cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976).

The unusual speed with which this case came to trial makes ascertaining the amount of front pay award more difficult than is typically the case. In most instances a trial is held significantly after the unlawful termination and in the interim the Plaintiff has obtained reemployment at lesser pay. The Court is then able to assess that pay with the light of hindsight and predict for purposes of front pay, future losses.

That means of measurement is absent here. The expeditious handling of this trial (See p. 404 supra) has obviated such collateral issues as whether or not there was irreparable injury which would have warranted the granting of injunctive relief, and eliminated a protracted period of time in which both parties would be with respect to this position in a state of limbo pending resolution of this controversy.

Moreover, the task of ascertaining damages is no more difficult than that which confronts the fact finder in any case in which a projection must be made as to the duration of time it would take for a plaintiff to secure comparable reemployment.

The Court has considered the suggestion of plaintiff's counsel that we make an award to cover a fixed period of time such as one year and that, at the expiration of such time, if plaintiff remains unemployed the Court condition a further award on a determination whether plaintiff has in fact been diligent in her efforts to obtain comparable work.

We reject this suggestion because it is cumbersome and because we believe that it would better serve the interests of the parties as well as the Court to fully resolve this matter at this time.

Compare *Patterson v. American Tobacco Company,* supra, where the cessation of plaintiff's front pay was conditioned on factors wholly within defendant's control and further Court oversight was unnecessary.

Plaintiff introduced expert testimony to the effect that the job market for personnel managers was extremely tight and that it was anticipated that a person in plaintiff's position would be unable to obtain reemployment in a comparable post and a comparable salary for a considerable length of time.

To some extent, plaintiff's difficulty in this regard is compounded by her having to seek employment without the aid of affirmative references from defendant.

One of plaintiff's expert witnesses, an employment agent, testified that the most recent personnel position she filled paid only $23,000 per annum and that in the past year she filled several such positions at annual salaries ranging from $18,000 to $25,000 and one at $30,000. The twelve office manager positions she filled paid annual salaries of only $15,000 to $25,000.

On the basis of this evidence, we conclude, first, that plaintiff will probably obtain reemployment in a comparable position in approximately one year's time, and second, that such reemployment will be at a salary of approximately $23,000, or put another way, $8,000 less than plaintiff was earning at the time of her dismissal; and third, that this disparity between her former and future rates of compensation will continue for at least a period of four years, after which we assume plaintiff will regain her proper position.

Accordingly, defendant is liable for an amount equivalent to one year's salary of $31,000, as well as the cash value of the health and insurance benefits plaintiff would have received for that year, plus a front pay award of $32,000, based on a salary differential of $8,000 per year for four years, less 3 weeks severance pay that plaintiff has already received and less unemployment benefits she will receive as a result of her dismissal. Cf. *Kallir Phillips,* supra, 420 F.Supp. 924 and note 13; *EEOC v. Steamfitters Local 638,* 542 F.2d 579, 591–592 (2d Cir.1976).

We do not include in the award for front pay the cash value of life and health insurance coverage she would have been entitled to had she remained in defendant's employ nor any factors representing the salary increases she claims she would have been awarded.

We are of the opinion that her subsequent employment will offer an employee benefits and pay raise opportunities comparable to those she enjoyed while working for defendant and that consequently she will, once she regains employment, suffer little or no loss in this regard.

Nor do we include in the one year salary award component of damages any sum representing the annual salary increase plaintiff argues she would have received effective July 1, 1983. As she herself has claimed and the Court has found above, these annual salary increases are based on merit, and while the Court is fully convinced that plaintiff's summary dismissal was retaliatory and not the result of the Blomquist incident, we cannot predict whether defendant employer would not have regarded this matter as a circumstance which would affect its determination with respect to merit salary increases.

Finally, the Court recognizes that plaintiff may, by the above-stated award obtain a windfall, and it is equally plausible that the award will prove inadequate. We have set a figure designed in our opinion to err, if at all, in plaintiff's favor, a tilting which we believe is justified in light of the origin of the problem—defendant's deliberate unlawful action—and the need to deter similar occurrences.

Plaintiff's counsel should submit within 30 days an order on notice and, unless obviated by an agreement between the parties, an application for allowable attorney's fees.