**Ellsworth PENDLETON, Plaintiff,**

v.

**NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES, Defendant.**

**No. 82 Civ. 6426 (SWK).**

United States District Court, S.D. New York.

Aug. 16, 1985.

Ellsworth Pendleton, plaintiff pro se; Jimmie Engram, New York City, of counsel.

Robert Abrams, Atty. Gen., for the State of N.Y., by Judith Kramer, Ellen Bronzo, Brenda S. Spears, New York City, for defendant.

## MEMORANDUM DECISION

KRAM, District Judge.

This action was commenced on or about September 28, 1982, by the filing of a complaint alleging that plaintiff's employer had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") by discriminating against him with respect to his race and by retaliating against him for filing a prior race discrimination charge with the United States Equal Employment Opportunity Commission ("EEOC"). The case was tried by the Court on January 9, 1984. At the close of trial, the parties were requested to submit post-trial briefs. Defendant submitted its post-trial brief on April 16, 1984. Despite repeated efforts to reach counsel for the plaintiff, both telephonically and in writing, to ascertain the status of plaintiff's post-trial brief, the Court was unable to obtain any information from plaintiff's counsel. Plaintiff's counsel did not file a post-trial brief on his client's behalf. On March 7, 1985, plaintiff submitted a post-trial brief, *pro se.*

The case is now before the Court for a determination on the merits of this action. The following constitutes the Court's findings of facts and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FACTS

Plaintiff is currently employed by the New York State Department of Correctional Services ("DOCS") as a correction officer ("C.O."). He was first hired by DOCS in October, 1978, to serve as a C.O. at the Otisville Correctional Facility.

On November 1, 1979, the State of New York imposed "a complete freeze on all hiring" for "all permanent and temporary positions." (Plaintiff's Exhibit 6.) The superintendents of the state correctional facilities were advised of this hiring freeze on or about November 14, 1979, by memo from the central office of DOCS, budget unit. (Plaintiff's Exhibit 7.) In accordance with that memo, the superintendent of "any facility experiencing individual position problems [was] to contact the central office budget unit for assistance." (*Id.*)

On December 5, 1979, plaintiff resigned his position as C.O. "effective immediately." (Defendant's Exhibit A.) In his letter of resignation, plaintiff asserted that he had been the victim of "constant undue pressure, [h]arrassment and [i]ntimidation" from his immediate superiors. (*Id.*)

On December 11, 1979, Mr. Pendleton filed a complaint against DOCS with the New York State Division of Human Rights ("NYSDHR") alleging racial discrimination. (Plaintiff's Exhibit 1.) In his complaint, Mr. Pendleton alleged that his superiors had continually harassed him and denied him equal terms and conditions of employment based on his race. (*Id.,* ¶¶ 4, 6.) Mr. Pendleton checked the box on the complaint form requesting the NYSDHR to accept the filing of his complaint on behalf of the EEOC as well, claiming the alleged discrimination violated Title VII.

Sometime in January, 1980, DOCS requested special approval to hire more correction officers to fill specific needs at certain of its facilities. (Tr. 40.) On or about February 6, 1980, DOCS obtained such approval to hire eighteen correction officers. (Tr. 29–30, 40.) DOCS then hired eighteen new people to fill those positions who reported to work on or about February 21st. (Tr. 29–30, 34.)

On February 7, 1980, a conciliation conference was held at Otisville Correctional Facility to investigate and attempt to conciliate the complaint that plaintiff had filed with the NYSDHR. The conference was attended by plaintiff, Sheila Ortega (the NYSDHR investigator), Al Young and Ellen Faucette (representatives of the Affirmative Action Office of DOCS), Philip Coombe (Superintendent of Otisville Correctional Facility), and the correction officers named in Mr. Pendleton's complaint. (Tr. 6, 15–16.) During that conference, a conciliation agreement was reached. The precise parameters of that agreement are very much in dispute; in essence, however, it was agreed that Mr. Pendleton would withdraw his complaint with the NYSDHR

in return for reinstatement by DOCS. (Tr. 6–8, 16–19, 43, 48; Stipulated Fact J, Pretrial Order filed January 4, 1984.) Mr. Pendleton did withdraw his complaint by letter written at the conference (Defendant's Exhibit B), and requested in writing reinstatement as a C.O. at Otisville (Plaintiff's Exhibit 5).

At the conference there was some discussion of the date Mr. Pendleton would or could be reinstated. Apparently, Superintendent Coombe said something like "If it were up to me, I'd reinstate you tomorrow; but it's not up to me, it's up to the people in Albany." (Tr. 17–18, 48.) Coombe further indicated that he felt Mr. Pendleton was one of his best C.O.'s, and that he would like to have him back on his staff. (Tr. 16.) Mr. Pendleton indicated that he could be ready to start work again on February 13th. (Tr. 7, 9; Plaintiff's Exhibit 5.) Mr. Pendleton left the conference believing that DOCS had agreed to reinstate him, and that he would be reinstated, on February 13th. (Tr. 8.) Ms. Ortega also believed that Mr. Pendleton would be reinstated on that day. (Tr. 19.)

On February 13, 1980, the NYSDHR officially ordered Mr. Pendleton's complaint withdrawn pursuant to the letter he had written at the conciliation conference. (Plaintiff's Exhibit 3.) Also on that day, Mr. Pendleton was not reinstated. When he was not reinstated, Mr. Pendleton called Superintendent Coombe to find out why he had not yet been reinstated. (Tr. 10.) It was then that he was advised of the hiring freeze. (Id.)

Mr. Pendleton then called Ms. Ortega to complain that he had not yet been reinstated. (Tr. 21.) Ms. Ortega called Superintendent Coombe to find out why Mr. Pendleton had not been reinstated, and was advised by Superintendent Coombe of the statewide job freeze. (Id.) Ms. Ortega then called Dr. Allen Bush, head of the Affirmative Action program for DOCS, who verified that a job freeze had been imposed. (Id.) Thereafter, Ms. Ortega attempted to explain to Mr. Pendleton that he had not been reinstated because of the job freeze. (Tr. 20.) Mr. Pendleton indicated that he felt he had not been reinstated because he had filed the original discrimination charge. (Id.) Accordingly, Ms. Ortega advised him of his right to file a retaliation complaint. (Tr. 20–21.)

On or about February 14, 1980, a memo was sent to the central personnel unit for DOCS by Otisville requesting the reinstatement of Mr. Pendleton and attaching a copy of his letter requesting same. (Defendant's Exhibit E.)

On or about February 19, 1980, Mr. Pendleton filed a complaint with the NYSDHR claiming that he had been retaliated against. (Plaintiff's Exhibit 2.) Mr. Pendleton checked the box on this complaint form requesting that the filing be made with the EEOC as well.

On or about April 4, 1980, a memo was sent to all facility superintendents from the central office of DOCS explaining the procedures for filling facility positions during the duration of the job freeze. (Defendant's Exhibit D.) Pursuant to these procedures, a request to fill facility positions was to be sent to the Chief Budget Analyst in the central office.

On or about April 8, 1980, Superintendent Coombe's staff followed up its February 14th letter requesting Mr. Pendleton's reinstatement with a phone call to the central personnel office of DOCS. Copies of the February 14th letter and of Mr. Pendleton's letter requesting reinstatement were again forwarded to the central personnel office. (Defendant's Exhibit H.) On that day, a letter was also sent to Ms. Faucette at the Affirmative Action group of DOCS advising of Mr. Pendleton's status on the reinstatment list and of the communications with the central personnel office, and enclosing copies of the February 14th letter and Mr. Pendleton's letter. (Defendant's Exhibit I.) Those letters were apparently shown to Dr. Bush by Ms. Faucette. (Id.; handwritten notation at top.)

On April 16, 1980, Dr. Bush sent a memo to the Chief Budget Analyst explaining the history of Mr. Pendleton's complaint and reinstatement request, and requesting ap-

proval to fill a specific position at Otisville by reinstating Mr. Pendleton. (Defendant's Exhibit G.)

On or about May 15, 1980, the hiring freeze was lifted. (Tr. 37.) On May 17, 1980, Mr. Pendleton was reinstated to his former position, albeit at another facility. (Defendant's Exhibit F.) Approximately ten correction officers who had requested reinstatement before Mr. Pendleton had were also reinstated in May after the hiring freeze was lifted. (Tr. 33.) It appears that, absent a job freeze, it normally takes anywhere from four to ten weeks from request to reinstatement. (Tr. 32.)

The NYSDHR found no probable cause to believe a violation had occurred on Mr. Pendleton's retaliation charge. (Tr. 14; Stipulated Fact P, Pretrial Order filed January 4, 1984.) The EEOC issued a right to sue letter on July 19, 1982. This action followed.

## DISCUSSION

Plaintiff claims that he was discriminated in his employment based on his race, and that he was retaliated against for filing a charge of discrimination. It would appear that plaintiff is arguing that both of his complaints—discrimination and retaliation—are properly before this Court. At the outset, therefore, the Court must determine the scope of the charges properly before it at this time.

On February 7, 1980, at the NYSDHR conciliation conference, plaintiff wrote a letter withdrawing his December 11th discrimination complaint. In that letter, he stated "I would like to withdraw my E.E.O.C complaint." (Defendant's Exhibit B.) On July 19, 1982, the EEOC issued the right to sue letter upon which this action is based. It is not clear from the face of that letter which charge is covered by the letter. Nonetheless, the parties apparently agree

that this letter was issued with regard to plaintiff's February 19th retaliation complaint. (Stipulated Fact P, Pretrial Order filed January 4, 1984.) Accordingly, the Court finds that the only charge properly before it at this time is plaintiff's claim that he was retaliated against for filing a discrimination complaint.

Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), provides in relevant part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

■ In order to establish retaliation under this section, the plaintiff must establish three elements: first, that he was engaged in some form of protected activity that the defendant was aware of; second, that the defendant made a disadvantaging employment decision regarding him; and third, that there was a causal connection between the two, *i.e.*, that the defendant intentionally[1] acted to the plaintiff's disadvantage because of his protected activity. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980); *EEOC v. Locals 14 and 15, Int'l Union of Operating Eng'rs*, 438 F.Supp. 876, 881 (S.D.N.Y.1977); *see also Francoeur v. Corroon & Black Co.*, 552 F.Supp. 403, 410 (S.D.N.Y.1982) (stating same elements as part of *prima facie* case).

■ The burden of persuasion in this case is on the plaintiff to prove those three elements. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *EEOC v. Locals 14 and 15*, 438 F.Supp at

---

**1.** *See Ganguly v. New York State Dep't of Mental Hygiene*, 92 F.R.D. 125, 127 (S.D.N.Y.1981) ("intent or motive is an essential ingredient"); *see also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("the 'factual inquiry' in a

Title VII case is 'whether the defendant *intentionally* discriminated against the plaintiff'") (*quoting Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1983)) (emphasis added).

881 ("burdens of proof in a Title VII retaliation case are no different than in any ordinary employment discrimination action"). The question before the Court now is "the ultimate question of discrimination *vel non," United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983), whether plaintiff has satisfied his ultimate burden of persuasion on all three elements and proved that he was retaliated against for engaging in a protected activity. The Court finds that he has not.

Plaintiff has satisfied his burden on the first element. He filed charges with the NYSDHR and the EEOC alleging racial discrimination. Such charges are protected activity under Section 704(a) of Title VII. *See Francoeur,* 552 F.Supp. at 410; *EEOC v. Locals 14 and 15,* 438 F.Supp at 881 ("filing of EEOC charges ... clearly what was intended to be meant by protected participation under section 704(a)"). Likewise, it is beyond peradventure that defendant was aware of this protected activity: several representatives of DOCS participated in the conciliation conference at Otisville on February 7, 1980.

Defendant argues with some force that plaintiff has not satisfied his burden of proof as to the second element. Plaintiff argues that he was not reinstated on February 13th, but rather was left unemployed for an additional three months prior to his reinstatement. Thus, plaintiff's argument goes, defendant failed to timely rehire him. This argument hinges upon plaintiff's contention that the agreement reached at the February 7th conference included a promise of reinstatement on a specific date—to wit, February 13, 1980. The Court is not persuaded that reinstatement on February 13th was part of the conciliation agreement. Three of the witnesses that testified at trial were present at the conciliation conference. Two of those witnesses, Ms. Ortega and Ms. Faucette, testified that Superintendent Coombe mentioned the need for approval from Albany before Mr. Pendleton could be reinstated. Moreover, Mr. Roulier testified that under normal circumstances, (absent a hiring freeze) reinstatement takes at least four weeks. Accordingly, the Court finds it unlikely that a specific date, just six days away, was given as an agreed upon date for Mr. Pendleton's return to work. The Court has no doubt that Mr. Pendleton honestly believed that he was to be reinstated by February 13th; however, the Court does not find that he was promised that, or that such prompt reinstatement was part of the conciliation agreement. Accordingly, plaintiff has not carried his burden of proving that his reinstatement was indeed "delayed" and, therefore, has not shown that he suffered a disadvantaging employment decision.

Even if Mr. Pendleton had carried his burden on the second element, he certainly did not satisfy his burden of proof on the third element. Defendant articulated a legitimate, non-discriminatory, non-retaliatory reason why Mr. Pendleton was not reinstated until May 17, 1980: the existence of a freeze on all hiring (including rehiring). *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). In light of this, plaintiff can satisfy his burden of proving intentional retaliation "either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of evidence," *i.e.,* that it is a mere pretext for retaliation and discrimination. *Aikens,* 103 S.Ct. at 1482 (*quoting Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). Plaintiff attempted to do this in two ways: first, by arguing that he was misled into agreeing to withdraw his complaint and, second, by arguing that he could have been reinstated earlier, since eighteen new C.O.'s were hired during the hiring freeze. These arguments are to no avail.

The Court recognizes that making employment decisions contingent upon a complainant's withdrawal of a prior EEOC complaint can, in some circumstances, constitute illegal retaliation. *See Kirkland v. Buffalo Bd. of Educ.,* 487 F.Supp. 760, 772–73 (W.D.N.Y.1979) (Brieant, J.), *aff'd,*

622 F.2d 1066 (2d Cir.1980). The mere fact, however, that Mr. Pendleton's reinstatement was part of an agreement whereby he was to withdraw his prior discrimination complaint does not prove retaliation. Mr. Pendleton was asked to, and did, withdraw his initial complaint as part of a conciliation of that complaint. To hold that this agreement was retaliatory could hamper the effective non-judicial resolution of disputes such as this.

Mr. Pendleton argues, however, that he was fraudulently induced to enter the conciliation agreement and, therefore, that the real reason for his delayed reinstatement was retaliation rather than the job freeze.[2] Mr. Pendleton points out that no mention was made at the conciliation conference of a hiring freeze, and this is supported by the record. (Tr. 10, 19, 48, 50.) Indeed, the first mention of a hiring freeze to Mr. Pendleton came after he withdrew his complaint and after he believed he would be reinstated. (Tr. 10.) Defendant, in its post-trial brief, argues that Mr. Pendleton knew, or should have known about the hiring freeze. There simply is *no* evidence in the record to support this assertion. *Compare Smith v. Rexall Drug Co.*, 548 F.2d 762, 764 (8th Cir.1977) (plaintiff, as member of union's negotiating team, knew or should have known about company's planned reduction of the work force). Mr. Pendleton asserts that he would not have agreed to withdraw his initial complaint had he known about the hiring freeze. (Tr. 13.) Thus, he claims, defendant's intentionally misled him into withdrawing his complaint.

The Court finds, however, that there is insufficient evidence that Mr. Pendleton was induced to withdraw his complaint for any reason of retaliation. It may have been clear to everyone present at the conference that Mr. Pendleton would not have agreed to withdraw his complaint had he known about the budget constraints on his immediate reinstatement. (*See* Tr. 23; Ms.

Ortega testified that *she* felt he would not have withdrawn his complaint had he known.) Nonetheless, this does not prove retaliation. It is equally clear that Superintendent Coombe wanted to conciliate the complaint. He stated that he felt Mr. Pendleton was one of his best C.O.'s. (Tr. 16.) Superintendent Coombe further indicated that he would like to have Mr. Pendleton back on his staff promptly. (Tr. 16–18.) Moreover, Ms. Ortega specifically discussed Mr. Pendleton's right to file a retaliation complaint during that conference. (Tr. 8, 20.) Indeed, Mr. Pendleton even mentioned his right to file a retaliation complaint in his letter requesting the withdrawal of his initial complaint. (Defendant's Exhibit B.) It defies logic to argue that Superintendent Coombe defrauded Pendleton in order to retaliate against him under these circumstances. The Court finds that if Superintendent Coombe misled Mr. Pendleton at all, he did so to speed his return to the staff and to facilitate a conciliation of the complaint, not to retaliate.

Mr. Pendleton's further argument that the hiring freeze was a mere pretext for retaliation and discrimination and that he could have been reinstated sooner, notwithstanding the freeze, as evidenced by the hiring of eighteen C.O.'s in early February is equally unavailing. Although the record is not as full as it might be, it is clear from the record that the hiring that took place was a one-time special case. Special budget approval was necessary to hire those eighteen officers (Tr. 30.) That approval was requested and obtained prior to Mr. Pendleton's request for reinstatement. (Tr. 40.) Apparently no one was hired between the time of Mr. Pendleton's request for reinstatement and the lifting of the hiring freeze. (Tr. 29, 34.) Approximately ten other officers requested reinstatement before Mr. Pendleton did, but they, too, had to wait until the lifting of the freeze. (Tr. 33.) Such evidence that others similarly situated (except for the protected activity) were treated identically to Mr. Pendleton

---

**2.** The Court has descried this argument from a liberal reading of Mr. Pendleton's post-trial brief.

rebuts his claim of pretext. *See McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. at 1825.

Moreover, it is clear that during the pendency of the hiring freeze defendant made a good-faith effort to expedite plaintiff's reinstatement. The staff at Otisville twice sent letters to the central personnel office requesting the reinstatement of Mr. Pendleton. (Defendant's Exhibits E, H.) The staff at Otisville also pursued Mr. Pendleton's request with the Affirmative Action section of DOCS. (Defendant's Exhibit I.) The Affirmative Action people pursued Mr. Pendleton's request with a memo to the Chief Budget Analyst. (Defendant's Exhibit G.) Indeed, Dr. Bush's memo complied with the new procedures announced in a memo from the central office of DOCS (Defendant's Exhibit D), and was written within a few days of his receipt of that memo and of a copy of the Otisville missive. Thus, on this record it appears that the defendant reinstated Mr. Pendleton as soon as possible given the state-wide budget constraints.

The Court is bolstered in its conclusion that Mr. Pendleton was not retaliated against by DOCS by the testimony of Ms. Ortega, the only truly disinterested witness to testify at the trial. Ms. Ortega was present at the conciliation conference and also had discussions with Mr. Pendleton, Superintendent Coombe, and Dr. Bush after the conference. She left the conciliation conference, like Mr. Pendleton, believing that he would be reinstated on February 13th. (Tr. 19.) She also testified candidly that she did not believe Mr. Pendleton would have withdrawn his initial complaint had he known that his reinstatement would be delayed by the budget crisis. (Tr. 23.) Nonetheless, she testified unequivocally that it was her opinion that Mr. Pendleton had not been retaliated against, but rather that the delay in his reinstatement had been a result of the budget crisis. (Tr. 22.) The Court agrees.

In sum, the Court finds that there is insufficient evidence to support a finding that Mr. Pendleton was misled into withdrawing his complaint, or that he was reinstated later than promised, because he had filed a claim of race discrimination. Accordingly, plaintiff has not satisfied his burden of proving that he was intentionally retaliated against for engaging in protected activity.[3] The Clerk shall enter judgment in favor of the defendant DISMISSING plaintiff's claim.

SO ORDERED.

---

3. Plaintiff makes no claim that he was retaliated against by DOCS failure to reinstate him on the day the freeze was lifted (two days earlier than his actual reinstatement). Finally, plaintiff does not seriously press his claim that his eventual reinstatement at Green Haven rather than Otisville constituted retaliation. Nor does it appear that he could properly press such a claim given his earlier requests for a transfer from Otisville. (Tr. 14.) In any event, the Court finds that this, too, was not retaliatory.