**Albert P. ABEL, Plaintiff,**

v.

**Albert L. BONFANTI, III, Fast Food Operators, Inc., d/b/a Popeyes Famous Fried Chicken and Biscuits, Hyman Schifrin, Alan Altman, Stanley Ratner and Steven Roman, Defendants.**

**No. 84 Civ. 9161 (RWS).**

United States District Court, S.D. New York.

Nov. 22, 1985.

Rundle-Britton, New York City, for plaintiff; Katharine A. Rundle, Ruth H. Schlesinger, of counsel.

Shea & Gould, New York City, for defendants (Except Altman); Mark E. Davidson, of counsel.

Moskowitz, Altman & Frankel, New York City, for defendant Alan Altman; Hyman Frankel, of counsel.

OPINION

SWEET, District Judge.

The defendants in this action, Albert L. Bonfanti III ("Bonfanti"), Fast Food Operators, Inc., d/b/a Popeyes Famous Fried Chicken and Biscuits ("FFO"), Hyman Schifrin ("Schifrin"), Alan Altman ("Altman"), Stanley Ratner ("Ratner") and Steven Roman ("Roman") have moved for summary judgment dismissing the complaint pursuant to Fed.R.Civ.P. 56. For the following reasons defendants' motion will be granted in part and denied in part.

**Pleadings and Facts**

Plaintiff Albert P. Abel ("Abel") filed this action in December, 1984 after being fired from his position as vice president of FFO. Abel, who is a white male employee, alleges in his complaint the violation of his civil rights, 42 U.S.C. §§ 1981, 1982, conspiracy to violate his civil rights, 42 U.S.C. § 1985, illegal wiretapping, 18 U.S.C. §§ 2511, 2520, breach of contract, fraud, defamation and tortious interference with his business and occupation.

Abel's complaint is based on the following set of facts drawn from the affidavits submitted with this motion. The facts, of course, must be construed in a manner most favorable for the party resisting summary judgment.

In January, 1984, the then-president of FFO, Aaron R. Fodiman ("Fodiman"), resigned. The Board of Directors of FFO hired Bonfanti to replace Fodiman as president and chief financial officer of FFO. Abel was then, as he had been since April, 1982, FFO's Director of Operations. As such, Abel was responsible for the daily operation of the ten Popeyes' Fried Chicken restaurants, and the hiring, firing and training of all management and supervisory personnel.

**1. Alleged discriminatory acts**

Around January 6, 1984 Bonfanti met with FFO's managers and supervisors to discuss his position as president of the corporation and the policies he intended to implement. Bonfanti stated to those managers and supervisors that FFO would no longer permit the hiring of individuals whose religious beliefs required the wearing of head coverings or beards. While this policy had not been enforced by the previous management, it was required under the pre-existing FFO Employee Guide. Abel contends that Bonfanti stated privately to him that FFO should cease the practice of hiring non-Americans.

Abel asserts that FFO's Middle Eastern managers were extremely upset at this new discriminatory policy that attacked their religious beliefs and wrote a letter to the Board of Directors expressing their fears and their support for Abel. These letters, however, do not include any indication of Bonfanti's alleged discrimination or of any discriminatory practices at FFO. Instead, they establish, at most, a strong personal allegiance to Abel and disappointment that Abel was not selected to become president of FFO.

On February 3, 1984, just two weeks after Bonfanti joined FFO, Abel tendered his written resignation to the entire Board of Directors of FFO, allegedly because he objected to Bonfanti's racially discriminatory policies regarding the Middle Eastern and other non-white managers and supervisors. The other reason cited by Abel for his tendered resignation was his frustration with overseeing Bonfanti's expenses in his duty to act as a comptroller over the FFO operations. At a meeting with Schifrin and Altman, Abel was persuaded to remain with FFO and was allegedly promised that he could be terminated only for cause.

In March and April of 1984, Abel alleges that Bonfanti discriminatorily ordered the firing of three Sikh Indians. With regard to these three Indian managers, Messrs. Dhawan, Singh and Chawla, the uncontradicted evidence establishes that each of these managers' personnel records contained reprimands by store supervisors which requested that the managers be terminated. Mr. Ajit Dhawan was fired on March 8, 1984 after verbal and written reprimands from his store supervisor, Bev-

erly Levinson. Mr. Gucharran Singh was reprimanded by his supervisor Malek Sulaiman on May 7, 1984 and after several more reprimands, quit voluntarily on June 11, 1984. Finally, Mr. Surinder Singh Chawla was reprimanded in several occasions by supervisors Vikvam Bhalla and Malek Sulaiman and was finally fired on July 30, 1984.

It is further uncontested that after Bonfanti began working as president of FFO and throughout the time period of Abel's complaint, FFO continued to hire a very high percentage of minority management employees. Thus, out of 27 management employees hired between January 26 and October 1, 1984, four were white Americans, six were black, six were from Latin America or the Caribbean, and eleven were from Pakistan or India.

Abel asserts that three of the white Americans and two light-skinned Latin Americans were hired as a result of Bonfanti's preference and favoritism of "whites" over "non-whites". However, each of these employee candidates were previously associated with Bonfanti in the food business which he operated prior to joining FFO. Moreover, several of those forced hires were soon fired either by Abel or Bonfanti. Abel has also submitted evidence that the minority management employees earned on average approximately $100 less per week than the white and Hispanic managers. At the same time, however, it has been established that, within the small sample examined by Abel, the white and Hispanic employees had almost eight years of prior experience in the food services business while the minority employees had only about four years of prior experience.

### 2. Alleged wiretapping acts

Around February, 1984, Bonfanti installed a voice activated tape recorder which could continuously record all calls on one of FFO's four telephone lines. The recorder was concealed beneath Bonfanti's office desk, and he did not reveal its existence to any subordinates. Bonfanti indiscriminately taped conversations placed on that telephone line. In April, 1984, Abel learned of the existence of this tape recording device from another employee and having found the device under Bonfanti's desk, removed one tape. Abel brought the tape recording to FFO's inhouse counsel, Altman, who destroyed the tape recording and advised Bonfanti that he should discontinue his practice of tape recording calls placed over that line. Upon the uncontradicted affidavit of Bonfanti, it appears that Bonfanti immediately disconnected the tape recorder. Abel made no further complaints about any wiretapping, but claims to have seen the recording device in Bonfanti's office on October 2, 1984, the day of his dismissal.

### 3. The dismissal

Over the months following the withdrawal of his resignation in February, 1984, Abel allegedly discovered numerous blatantly illegal practices and acts by Bonfanti including deliberate misrepresentations on an SEC filing, fraudulent insurance claims, fraudulent expense vouchers and the recruitment of an employee of FFO's franchise to engage in industrial espionage. Abel reported all of these events to FFO's Board of Directors, including Schifrin and Altman.

Around September 27, 1984, Bonfanti requested a private meeting with Abel in which he demanded either the full personal commitment of Abel or else his resignation. Abel reported the content of this meeting to Schifrin. Around October 1, Bonfanti and Abel had another private meeting during which Abel expressed his commitment only to FFO rather than to Bonfanti personally, and during which Bonfanti accused Abel of "bugging" his office to obtain evidence of any damaging information. Finally, on October 2, 1984, Abel was summoned to a meeting with Bonfanti and Schifrin at which time Schifrin also accused Abel of bugging Bonfanti's office. While there is no evidence that Abel actually "bugged" Bonfanti's office, he apparently admitted to Schifrin that he had told Bonfanti about

such activity. Accompanied by an obscenity, Schifrin yelled at Abel, "You're fired."

**Discussion**

### I. Retaliatory discrimination under 42 U.S.C. § 1981

Section 1981 provides a federal remedy against discrimination in private employment on the basis of race and states that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, given evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

■ This Circuit has held that a white person who has been punished for trying to vindicate the rights of minorities may bring an action under § 1981, *DeMatteis v. Eastman Kodak Company*, 511 F.2d 306, *reh'g on other grounds*, 520 F.2d 409 (2d Cir. 1975). More recently, the Second Circuit has set forth the standard for employment discrimination claims under § 1981. *Choudhury v. Polytechnic Institute of New York*, 735 F.2d 38 (2d Cir.1984). The same elements required for a claim for discrimination under Title VII are sufficient to state a claim under § 1981. *Id.* at 44. In turn, the elements which state a Title VII retaliation suit have been set forth in *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43 (2d Cir.1980). Thus Abel must show that:

> (1) he engaged in an activity protected under Title VII, of which defendant employer had knowledge,
> (2) that defendant employer harmed plaintiff in his employment, and
> (3) that a causal connection between the first two elements exists, that is, a retaliatory motive played a part in the employer's adverse employment actions.

With regard to the first element of a *prima facie* case for retaliation, Abel is not required to show that the underlying challenged activity was in fact illegal discrimination. In *Choudhury, supra,* 735 F.2d at 43, the Court stated that "[a]n employee who is punished for seeking administrative or judicial relief, regardless of the merits of his initial claim, has failed to secure the right to equal treatment which constitutes the fundamental promise of § 1981." In this action, of course, Abel did not seek any administrative or judicial remedies for the alleged discrimination to FFO's minority employees, but merely complained to his immediate superior. In these circumstances of "informal" protected activity, a plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. *Francoeur v. Corroon & Black Co.*, 552 F.Supp. 403, 412 (S.D.N.Y.1982). *See Parker v. Baltimore & Ohio Railroad*, 652 F.2d 1012, 1020 (D.C.Cir.1981).

■ Without deciding whether the actions taken by FFO during Bonfanti's tenure actually represent discriminatory practices which violate the law, those facts do not support the inference that Abel had a good faith belief that there existed discriminatory employment practices at FFO. The February speech by Bonfanti requiring of clean-shaven employees is racially neutral, and while Abel asserts that the requirement was intended to discriminate against Sikh Indians, such religious discrimination is irrelevant for the purposes of a § 1981 claim. *See Catholic War Veterans of U.S., Inc. v. City of New York*, 576 F.Supp. 71, 74 (S.D.N.Y.1983). Moreover, such a requirement was entirely consistent with a long-standing employee rule at FFO and the health guidelines of the City of New York. Abel has brought forth no evidence to show that this requirement was a mere pretext.

With regard to the alleged dismissal of three Indian employees and the forced hiring of white employees, the record indicates an absence of discriminatory treatment. The majority of new employees hired after Bonfanti became president were from minority groups; each of the Indians were dismissed or resigned for legitimate

business reasons, and the white employees were recommended by Bonfanti because they were formerly employed by him at another company. Finally, the $100 differential in white and minority salaries was not mentioned in Abel's complaint and, therefore, it is highly unlikely that this evidence, brought forth in the process of this litigation, was ever noticed by Abel when he was actively employed by FFO.

Finally, Abel offers nothing but conclusory allegations that he was engaged in "protected activity" under Title VII. His affidavit merely states that "[e]veryone knew that I was trying to get Bonfanti to back off from his racial discrimination." Despite this claim, Abel has not submitted any supporting affidavits from alleged victims of discrimination nor any contemporaneous evidence of his efforts to prevent the alleged discriminatory actions of Bonfanti. Therefore, the basis for Abel's claim of good faith objection to discriminatory practices rests solely on unspecific and unsupported allegations and "such conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

■ Even assuming that Abel did engage in a protected activity and complained about perceived discriminatory practices, his § 1981 claim must be dismissed for another reason. There is no evidence on the record to suggest that Schifrin's decision to fire Abel on October 2, 1984 was in any way connected to Abel's alleged resistence to Bonfanti's speech to the employees in February, 1984 or the termination of the Indian managers during March and July of 1984. There is abundant evidence in Abel's own complaint and affidavits that his personal struggle with Bonfanti revolved around his duties as comptroller and the accusation that Abel bugged Bonfanti's office. While it is true that this Circuit recently rejected the requirement of "but for" causation in retaliatory discrimination cases, *see Grant, supra,* 622 F.2d at 46; *Sims v. Mme. Paulette Dry Cleaners,* 580

F.Supp. 593, 596 (S.D.N.Y.1984), Abel must nevertheless set forth some evidence that the "adverse action was at least in part because [he] engaged in protected activities." *Sims, supra,* 580 F.Supp. at 596.

Abel asserts that the failure of defendants to discuss the bugging charge at greater length indicates it was a mere pretextual reason to obscure the strong discriminatory animus against Abel. The case cited in support of this proposition, however, is distinguishable. *See Francoeur, supra,* 552 F.Supp. at 410–11. In the *Francoeur* case, the plaintiff had filed a formal EEOC charge barely one month prior to her dismissal. The pretextual incident proffered by the defendant was a single personnel dispute which arose in plaintiff's department. The court found very significant the fact that defendant's representatives failed even to mention this personnel dispute to the plaintiff, although they spoke with her the day before she was fired. The present case does not remotely resemble the *Francoeur* case. Here, as opposed to the situation in *Francoeur,* the allegedly pretextual reason was referred to at the time of firing. The facts alleged are insufficient to support the conclusory allegations of discriminatory retaliation. Therefore, Abel's first cause of action under 42 U.S.C. § 1981 must be dismissed.

■ Since there is nothing to indicate that the defendants, collectively or individually, intended to dismiss Abel because of his resistance to their alleged discriminatory practices, Abel's third cause of action alleging a conspiracy under 42 U.S.C. § 1985(3) must also be dismissed.

## II. Abel's property rights under 42 U.S.C. § 1982

■ In his second cause of action, Abel contends that defendants violated 42 U.S.C. § 1982 by terminating his employment agreement and interfering with his business interests and employment. Section 1982 provides that:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens

thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982. Abel's claim is not well-founded because § 1982 applies to racial discrimination with respect to transactions in real and personal property but not to employment discrimination claims. *See Johnson v. Duval Country Teachers Credit Union,* 507 F.Supp. 307, 310 (M.D.Fla. 1980); *Foreman v. General Motors Corp.,* 473 F.Supp. 166, 177 (E.D.Mich.1979).

█ While the Supreme Court has recognized, under some circumstances, a property right in continued employment, *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971), such a property interest has not been recognized as protected by § 1982. *Tate v. Hills-McCanna Co.,* 29 Empl.Prac.Dec. (CCH) ¶ 32,944 at 26,463 (N.D.Ill.1982). In *Tate, supra,* the Court stated:

> "While employment discrimination claims are not expressly excluded from section 1982, the wording of that provision clearly limits its application to transactions in real and personal property, such as leasing, selling and conveying such property."

Whatever property rights Abel may be able to establish regarding his alleged right to continued employment at FFO, these rights are not those than can be inherited, purchased, leased, sold or conveyed, and, therefore, are not covered by § 1982.

### III. Defendants' alleged illegal wiretapping

Abel has asserted that Bonfanti violated 18 U.S.C. §§ 2511 and 2520 by tape recording telephone calls placed on one of FFO's telephone lines. Section 2511 establishes criminal liability for any person who "wilfully intercepts ... any wire or oral communication ...." Section 2520 provides a private right of action for actual and punitive damages to "[a]ny person whose wire or oral communication is intercepted, disclosed or used in violation of this chapter...."

Bonfanti argues that Abel's wiretapping cause of action must be dismissed for two reasons. He relies first upon 18 U.S.C. § 2510(5)(a) which provides an exemption to non-consensual overhearing of communications over an extension phone which is being used in the ordinary course of business. *See Anonymous v. Anonymous,* 558 F.2d 677, 678–79 & n. 5 (2d Cir.1977). Section 2510(5)(a)(i) provides the so-called extension phone exemption from the federal wiretapping laws. It states that:

> (5) "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire or oral communication other than—
>
> > (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a communications carrier in the ordinary course of business and being used by the subscriber in the ordinary course of its business....

The *Anonymous* opinion apparently is the only interpretation of the extension phone exemption in this Circuit. It is of limited usefulness in the present case since the Court in *Anonymous* was faced with a purely domestic conflict in which the defendant husband had instructed his son to tape record all incoming telephone calls from his wife. The Court held that the defendant's eavesdropping and recording of his wife's and daughter's conversations from an extension phone were in the ordinary course of business since the legislative history explicitly stated that such personal conversations overheard by family members were not intended to be punishable under the wiretapping statute. Moreover, the Court held that the use of a tape recording device to preserve a conversation on an extension phone in the absence of the husband did not make that eavesdropping unlawful.

The defendant in *Anonymous* tape recorded the conversations by means of an automatic answering machine purchased from a local retail store. While such a device appears not to be an instrument furnished to the subscriber by a communications carrier as required by the statutory exemption, the Court nevertheless found the extension phone exemption applicable.

Therefore, it appears that the means of intercepting the communication, as long as the device is attached to an extension phone outlet, is irrelevant except insofar as it relates to whether the interception is in the ordinary course of business. The other aspect of the statute which was not directly addressed in the *Anonymous* opinion was the clause "being used by the subscriber or user in the ordinary course of its business...."

By distinguishing several cases decided in other Circuits, the *Anonymous* opinion provided a tentative outline of the extension phone exception. The Court expressed approval of the holdings in *United States v. Jones*, 542 F.2d 661 (6th Cir.1976), and *United States v. Schrimsher*, 493 F.2d 848 (5th Cir.1974), which upheld the applicability of the wiretap statistics in situations where the defendants indiscriminately taped all incoming and outgoing calls of their wife or lover and thus "invaded the privacy of innumerable persons, known and unknown." *Id.* at 679. At the same time, the Court rejected the broader holding of *United States v. Harpel*, 493 F.2d 346 (10th Cir.1974), that no eavesdropping over an extension phone without one party's consent would be in the ordinary course of business. *Id.* at 679 n. 6. Therefore, the *Anonymous* case suggests that the extension phone exemption is not to be applied or rejected in a wholesale fashion, but rather the circumstances of the eavesdropping and the content of the overheard conversations must be examined to determine whether the eavesdropping constitutes a use in the ordinary course of business.

The recent cases from the Fifth and Eleventh Circuits provide more direct precedents for Abel's wiretapping cause of action. *Briggs v. American Air Filter Co., Inc.*, 630 F.2d 414 (5th Cir.1980); *Watkins v. L.M. Berry & Co.*, 704 F.2d 577 (11th Cir.1983). Each of these cases examined the elements of a private wiretapping cause of action against an employer or fellow employee for alleged wrongful interception of telephone calls made and overheard on office telephones.

In the *Briggs* case, the Court explored the legislative history of the ordinary course of business clause and found little evidence which would clarify the intent behind the phrase. The *Briggs* case arose after a company supervisor listened to and tape recorded part of a conversation between an employee and his friend who worked for a competing firm. This eavesdropping occurred after the employee had been admonished not to discuss business with the friend because of suspicions regarding the disclosure of confidential information. The taped conversation was conceded to be a business conversation.

The *Briggs* opinion discussed one possible definition of "use in the ordinary course of business." One obvious distinction is between eavesdropping by those persons who have authorization to have access to the phone and the same eavesdropping by one who had no business authorization to be in the office or use the phone. Ultimately, however, the Court relied on the close business relationship between the content of the telephone call and the reason behind the supervisor's monitoring.

In the *Watkins* case, the intercepted telephone call was of a personal rather than business nature. The Court held that in the context of a business office, "a personal call may not be intercepted in the ordinary course of business ... except to the extent necessary to guard against unauthorized use of the telephone or to determine whether a call is personal or not." 704 F.2d at 583.

 Without deciding whether Abel will ultimately succeed on his wiretapping claim, it at least appears that his claim cannot be dismissed on summary judgment. Abel has asserted that his personal calls were intercepted without his consent or knowledge through Bonfanti's use of a tape recorder on his office extension. While Bonfanti has proffered a business purpose for using the recorder and has claimed that he minimized his intrusions on personal calls, these rationales are sharply disputed by affidavits submitted by Abel. Therefore, a factual dispute is present as to whether Bonfanti's recording of Abel's telephone calls was in the ordinary course of business.

Defendant's second ground for opposing Abel's wiretapping charge is based on the requirement that a defendant must act "willfully" before any criminal or civil liability attaches. *Citron v. Citron,* 722 F.2d 14 (2d Cir.1983), *cert. denied,* 466 U.S. 973, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984). The *Citron* case establishes that the stringent definition of willfulness applies to both civil and criminal actions under Title III of the Omnibus Crime Control and Safe Streets Act of 1968. By using the term willfully, Congress intended to require "at least a voluntary, intentional violation of, and perhaps also a reckless disregard of, a known legal duty ...." *Citron,* 72 F.2d at 16. *See also United States v. Murdock,* 290 U.S. 389, 394–95, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933) ("when used in a criminal statute, [willful] generally means an action done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely. The word is also employed to characterize a thing done without ground for believing it is lawful, or conduct marked by careless disregard whether or not one has the right so to act").

Bonfanti's actions, when construed in a light most favorable for Abel, may establish that he intercepted taped conversations in reckless disregard of the legal duties required by the federal wiretapping laws. The facts in this case are far different from those underlying the *Citron* case, where the wife of the plaintiff became apprehensive about the legality of her conduct after recording a few calls and requested the advice of counsel. 722 F.2d at 15. Therefore, it would be inappropriate to dismiss Abel's wiretapping cause of action at this stage of the proceedings on the grounds that the required standard has not been met. *See Watkins, supra,* 704 F.2d 577.

### IV. Breach of contract

■ Defendants' notice of motion has only requested summary judgment with regard to the federal law claims raised by Abel. However, they have also requested an order pursuant to Rule 12(b)(6) dismissing the complaint, and in connection therewith have submitted affidavits and arguments requesting the dismissal of Abel's breach of contract claim. Since matters outside the pleading have been presented for the court's consideration, it is appropriate to treat this motion to dismiss as a motion for summary judgment. *See* Fed.R. Civ.P. 12(b)(6). Summary judgment on Abel's breach of contract claim will be denied because Abel has properly stated a claim as required by the case of *Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y. S.2d 193, 443 N.E.2d 441 (1982). The *Weiner* case requires that the "totality of all ... the attendant circumstances" be examined to determine whether an employer has agreed not to terminate an employee except for cause. *Id.,* 457 N.Y.S.2d at 198, 443 N.E.2d at 446. In this action, as in *Weiner,* there is sufficient evidence of a contract for Abel to maintain his cause of action. Abel claims that he submitted his resignation in February, 1984 and considered offers from other employers at that time. He states that, in reliance on defendants' express promise not to terminate him except for cause, he withdrew his resignation. Finally, Abel supports his contract claim by evidence of FFO's employment policies regarding termination. Each of these allegations raises factual issues which cannot be dismissed on summary judgment.

■ The cases cited by defendants do not compel a different conclusion. This case presents the question of an express rather than implied contract analyzed in *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983). The case of *Gicaney v. Prudential Bache Securities, Inc.,* N.Y.L.J., Feb. 4, 1985, at 14 (S.Ct.N.Y. Co.), which discusses the requirement that an employee rely on his employer's promise is only relevant to Abel's initial hiring but does not foreclose inquiry into the facts surrounding the February, 1984 withdrawal of resignation. Finally, the dictum in *Leahy v. Federal Express Corp.,* 609 F.Supp. 668, 672 (E.D.N.Y.1985), that "even an oral representation that employees could not be fined without just cause do not satisfy the panoply of requirements set forth in *Weiner*" seems to be an overstate-

ment. Such a promise is alone not enough to establish a claim, but when coupled with an employee's reliance, it is sufficient to raise triable issues of fact.

### Conclusion

For the foregoing reasons, Counts I, II and III of Abel's complaint are hereby dismissed.

IT IS SO ORDERED.