Judy JAMES, Plaintiff,

v.

Marvin T. RUNYON, Post Master General of the United States, Defendant.

No. 91–CV–0246.

United States District Court, N.D. New York.

Jan. 18, 1994.

Sandra H. Adams, Buffalo, NY (Sandra H. Adams, of counsel), for plaintiff.

Gary Sharpe, U.S. Atty., N.D.N.Y., Albany, NY (James C. Woods, of counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

McAVOY, Chief Judge.

Plaintiff filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, alleging that she was discharged from service with the United States Postal Service on the basis of her gender and in retaliation for reporting a sexually suggestive or harassing comment made by a co-trainee. Plaintiff asserts that as reprisal for her complaint, she was given more difficult tasks than other probationary trainees during her probationary period, was evaluated on a subjectively unreasonable basis, and was lectured by her superiors in a "disrespectful and hostile" manner.

The government contends that during her probationary period plaintiff was assigned tasks similar to other probationary trainees yet scored poorly on many of them. Even after counseling and specialized attention, the government claims that plaintiff's work did not meet the acceptable threshold and her employment was therefore terminated. The government asserts that plaintiff has not

established a *prima facie* case of sex discrimination in that she cannot demonstrate that her job performance was satisfactory or that she was treated less favorably than comparable male trainees. Furthermore, the government claims that even if plaintiff can establish a *prima facie* case of sex discrimination, she cannot show that defendant's legitimate, nondiscriminatory reason for discharging her was pre-textual.

The matter of *James v. Runyon*, 91–CV–246, 1993 WL 173468, was tried before this court without a jury on May 17 to 19, 1993. This Memorandum–Decision and Order constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

Following her discharge from the United States Postal Service, plaintiff sought EEO counseling on April 14, 1989. Following the conclusion thereof, she filed a formal EEO complaint (No. 160–90–8047) on May 31, 1989, alleging sex discrimination and retaliatory discharge. On June 13, 1989, the Postal Service issued a final decision addressing her allegations and thereafter, on November 1, 1989, plaintiff requested a hearing. A hearing was held on April 26, 1990, and on May 8, 1990, the Administrative Law Judge issued her recommended decision of no discrimination. Following the Postal Service's adoption of the decision on June 5, 1990, plaintiff filed her *pro se* complaint in the United States District Court for the Northern District of New York on March 5, 1991.[1]

### FINDINGS OF FACT

*Initial Training and Employment at the Endicott Post Office*

The following facts were developed at trial. Plaintiff, a white female, was hired as a part-time flexible mail carrier ("PTF") at the post office in Endicott, New York ("Endicott") on January 28, 1989. Prior to commencing employment at Endicott, plaintiff reported for a 5–day orientation program in Binghamton, New York, and was made part of a training group consisting of ten men and two women. The training included such things as general safety, vehicle operation and practical instructions.

During the training period, plaintiff and her lone female co-trainee were the subject of a crude and vulgar comment uttered by a fellow probationary trainee.[2] The remark was made in the company of plaintiff and the other trainees, but no trainer or supervisor was present. Upset by the incident, plaintiff reported it to her training supervisor, Charles Mead ("Mead"). Mead indicated that he would communicate plaintiff's complaint to Endicott Postmaster Richard Nealy ("Nealy"). It is not disputed that there were no further incidents of vulgar or sexually suggestive behavior, whether by the same trainee, other trainees, or plaintiff's supervisors.

The following week, plaintiff reported for duty to Endicott to begin her 89–day probationary period.[3] Five other new hires from plaintiff's training group—four men and her one female co-trainee—were also assigned to Endicott. Shortly after beginning work, plaintiff was called into Nealy's office. Without asking plaintiff about the incident, Nealy informed her, in sum and substance, that the occurrence did not constitute sexual harassment. At the time, Nealy offered to call into his office the trainee who had uttered the remark, but plaintiff declined such a confrontation indicating that she had nothing to say to him. Although plaintiff asserted that her "harasser" was a personal friend, or at least an acquaintance, of Postmaster Nealy, the

---

1. Plaintiff initially commenced her action by filing a *pro se* complaint and was thereafter represented by several attorneys.

2. The statement, uttered aloud by a male co-trainee as he returned from the lavatory, was a disgusting, metaphoric reference to plaintiff and her female co-trainee. Suffice it to say that the particular words used and message conveyed were vulgar and offensive.

3. United States Postal employees are hired subject to a three month probationary period. During that period, their ability to perform a variety of tasks is evaluated by postal supervisors. Probationary employees differ from non-probationary employees because the former can be terminated during the probation period without resort to contractual and/or grievance rights.

evidence indicated that they had no prior personal or social relationship.

*Probationary Period and Evaluation of Plaintiff's Performance*

During plaintiff's first week of work, all the new PTF"s received general orientation and instructions on casing and delivering mail.[4] In addition, each new PTF was paired with an experienced mail carrier and worked various mail delivery routes. The supervisors at Endicott and Endwell, N.Y. (a substation of the Endicott office) were Jeanette Coleman ("Coleman"), Thomas Corcoran ("Corcoran"), and James Flick ("Flick"). They were primarily responsible for training the new PTF"s and evaluating their performance. Initially, the PTF"s did not receive individual evaluations but were provided with group feedback. Although they were generally told to get out of the office sooner to begin their routes earlier, plaintiff testified that she was never instructed as to specific time standards or goals she would be expected to meet with respect to casing or delivering the mail.

Nonetheless, plaintiff was advised of the five factors by which she would be evaluated. These criteria were contained on a monthly evaluation form, lettered "A" through "E," and included attendance/punctuality, ability to follow directions, compliance with postal regulations, task performance and job knowledge. At the end of each thirty day period during the probationary period, each trainee was to receive a written evaluation. Each criterion was rated on a scale of 1 to 2, or 1 to 3, higher numbers representing better performance. In addition to the five base criteria, PTF"s would receive an "Overall" performance rating generally consisting of narrative comments. All trainees, both male and female, were evaluated using the same performance criteria. In addition to the monthly written evaluation form, daily notes were compiled to summarize the new PTF"s

performance. These notes were not provided directly to PTF"s, but were retained by the supervisors as an aid to completing the monthly evaluations.

Plaintiff was informed that she would receive a written evaluation at 30 days, 60 days and 90 days into the probationary period. At trial, plaintiff's 30-day and 60-day evaluations were received in evidence. The plaintiff had received a "1" rating on all five criteria on her 30-day evaluation. The overall rating read: "Fails to meet requirements, separation recommended." After receiving the 30-day evaluation, plaintiff was not advised as to how she could improve, nor did she ask for such feedback, and no new goals were set for her performance.

Plaintiff's daily evaluation forms, approximately thirty of which were received in evidence, reflected various criticisms. Representative comments regarding plaintiff's mail delivery performance included such things as "paces on street are slow," "took keys home with her," "left Jeep lights on," "Judy not performing well, took longer than assigned time," and "failed to lock Jeep." Other less specific criticism included "general confusion."

Early in her probationary period, plaintiff was assigned to the Endwell substation. Supervisor Corcoran played a pivotal role in her supervision and training there, showing her various delivery routes and giving her further instruction on how to properly "case" mail. Corcoran also timed plaintiff's performance in casing mail; quite literally, he stood very close behind plaintiff and measured her speed with a stopwatch. In this regard, at the very least, it is clear that Corcoran treated plaintiff differently than the other new PTF"s, both male and female. The underlying reason for the disparate treatment, however, is not clear. Whether Corcoran did so in an attempt to intentionally pressure plaintiff, or whether he simply

---

**4.** The two principal duties of a mail carrier involve casing and carrying mail. "Casing" generally involves separating and sorting mail, and then, while standing in front of a large compartmentalized "case," placing each piece of mail in its appropriate compartment based upon mail-type and geographical location. An employee's ability to "case" is measured by the number of

"feet" of mail he or she can sort per hour. The ability to perform the other principal task—delivering the mail—is also gauged by speed and accuracy. Each established route at Endicott has a target time within which the mail should be cased and delivered, and it was against these standards, *inter alia,* that the new PTF"s were evaluated.

felt she needed extra help, was not substantiated by the testimony. Other evidence did indicate, however, that Corcoran attempted to assist *all* trainees in learning their casing duties by color-coding the mail case for Route # 98.

Not all of plaintiff's feedback was negative. Sporadically throughout the probationary period, she received positive comments from various mail carriers. One carrier informed plaintiff that her time on a particular route was better than the other new trainees by more than one minute. Another told her, after she was placed on a different route, that she was "doing better." A third carrier reported that although he had not observed plaintiff carrying mail on his route, plaintiff had completed the delivery in only four and one-half hours, a very good time for a PTF considering that the target time was between five and five and one-half hours.

Plaintiff received her 60–day written evaluation at the end of March, 1989. Plaintiff again received a "1" rating on all five criteria except for category "C" (compliance with postal regulations) in which she received a "2". The "Overall" rating read: "fails to meet expectations, separation recommended if no drastic improvement by 4–15–89."

Various charts prepared by plaintiff and her counsel were received in evidence, and they summarized the daily evaluations of all five new PTF's at Endicott. Plaintiff's counsel did a commendable job of demonstrating that plaintiff performed as well as or better than her co-trainees on like tasks, as measured by objective criteria, but nevertheless received lower subjective ratings by her supervisors. While not entirely consistent, there were more than a few occasions where this was true. By way of example, plaintiff and a male co-trainee both carried Route # 43 in February, 1989, and although plaintiff was working the route for the first time, and the male trainee had worked it before, the time it took plaintiff to finish the route was somewhat less. Despite this fact, plaintiff received no rating and the male PTF received a "satisfactory" rating. Of course, this particular instance might easily be attributable to the fact that they were evaluated by different supervisors. A similar instance occurred when plaintiff and a male co-trainee both carried Route # 38 for the first time. Although plaintiff's delivery time was significantly less, Supervisor Corcoran gave her an "unsatisfactory" rating and commented that her "street time needs improvement," while the co-trainee received no rating and a comment of "good for first time." Likewise, when plaintiff carried Route # 4, her delivery time was almost identical to that of a new male PTF, nevertheless, she received an "unsatisfactory" rating with the comment "ran over," and the male received a "satisfactory" rating with the comment "very good." Likewise, in carrying Route # 7, plaintiff's first delivery time was significantly *lower* than two other new trainees, one male and one female, and yet, plaintiff received no rating with the comment "mail not ready, had to get own car," while both co-trainees received a "satisfactory" rating, with a comment to one that read "good for first time." Once again, on Route # 24, plaintiff's delivery time was less than a male co-trainee, but she received an "unsatisfactory" and the male received a "satisfactory."

Plaintiff's counsel also attempted to demonstrate that plaintiff received comparatively negative evaluations as reflected by the subjective comments of the supervisors during the second 30–day period of work. While this was certainly the case—plaintiff received mostly "unsatisfactory" ratings and all other trainees received mostly "satisfactory" ratings—it was not clear whether apples were being compared with apples. That is, although the subjective comments ascribed to plaintiff were generally unfavorable, it was not clear whether the comments pertained to the same work or assignments for each PTF. In that regard, the evidence was of little value. Nevertheless, several mail carriers testified that plaintiff had performed her mail delivery duties satisfactorily.

*Postmaster's Assessment of Plaintiff's Performance*

Of particular note was the testimony of then-Postmaster Nealy. Concerned about the consistently negative evaluations plaintiff was receiving from Supervisors Corcoran and Coleman, Nealy took it upon himself to one day accompany plaintiff on her assigned

route to personally evaluate her performance. Nealy testified in unequivocal terms that based upon his observations of plaintiff, she *was* qualified to deliver mail and, in fact, did it "very well." Based on these observations, Nealy surmised that there must have been some other reason plaintiff was not performing satisfactorily, and ultimately concluded that she had a "negative attitude" and would never improve.

To be certain, the foregoing facts concerned only plaintiff's performance with respect to carrying and delivering mail. Although it was plain that many of plaintiff's subjective daily evaluations were not as favorable as her male counterparts, despite her having demonstrated better performance on like tasks, it is equally apparent from the record that much of the criticism directed toward plaintiff was based upon her overall "attitude" and performance in casing the mail.

Still, plaintiff's initial performance in casing mail was not markedly different from that of other new trainees in her group; all had difficulty in getting mail out in a timely fashion early in their probationary period. This became such a problem with one male PTF in particular that the supervisors pushed the daily starting time back by fifteen minutes on at least two occasions to give the new PTF's more time to prepare the mail for delivery. Nealy testified, both at the prior EEO hearing and in the instant trial, that he was not concerned about plaintiff's ability to case mail or he would have made it a point to observe her doing so. Moreover, Nealy's express reason for terminating plaintiff was based upon his conclusion that her attitude toward work was in some way negative.

*Discharge From the Postal Service*

Based upon the supervisors' collective recommendations that plaintiff showed "no overall improvement," was "still confused," and "not aggressive," Nealy terminated plaintiff on April 13, 1989. Plaintiff received a certi-fied slip from Postmaster Nealy notifying her of the termination. The letter made plaintiff's termination effective on April 14, 1989. It stated:

> Specifically, you have not demonstrated the ability to follow instructions provided by your supervisors. This, in turn, has had a detrimental effect upon development of casing abilities requiring additional time and assistance on a regular basis. This has also been observed in the performance of your street duties, where you have required additional time or assistance from other carriers to complete these duties. These deficiencies are due to a number of factors, a primary one being your attitude, which has been cited as being less than positive on a number of occasions.

Plaintiff spoke with Nealy thereafter and asked him why she was discharged. He indicated to her that there was a "physical problem," in that she couldn't handle the job physically, and she might be better suited for a clerk position. Plaintiff immediately initiated the aforementioned EEO proceedings.

## II. DISCRIMINATORY DISCHARGE

### A. APPLICABLE STANDARDS

Actions brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*,[5] as amended, involve a burden shifting analysis. *Russo v. Trifari, Krussman & Fishel,* 837 F.2d 40, 43 (2d Cir.1988). First, plaintiff must prove a *prima facie* case of discrimination by a preponderance of the evidence. Second, once plaintiff has presented such a *prima facie* case, the burden shifts to the defendant to "articulate" some nondiscriminatory reason for the alleged discriminatory action. Finally, in the event that the defendant is able to meet its burden, plaintiff must be given the opportunity to prove by a preponderance of the evidence that the proffered reasons are merely a pretext for discrimination. *See Texas Dep't of Community Affairs v. Bur-*

---

**5.** Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part:

   It shall be an unlawful practice for an employer—

      (1) to fail or refuse to hire or to discharge any individual, otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; ...
42 U.S.C. § 2000e–2(a)(1).

*dine,* 450 U.S. 248, 253–254, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); *Lowe v. Commack Union Free Sch. Dist.,* 886 F.2d 1364, 1369 (2d Cir.1989). Recently, the Supreme Court has interpreted "pretext for discrimination" to mean not merely a showing of falsity, but a showing of true discriminatory intent by the employer. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993).

Now, the court proceeds to examine each of the steps in the burden shifting analysis in order to determine whether the plaintiff has put forth a viable cause of action pursuant to Title VII. We must be mindful that regardless of how these burdens are described, plaintiff retains the ultimate burden of persuading the fact finder. *See Lopez v. Metropolitan Life Ins. Co.,* 930 F.2d 157, 161 (2d Cir.1991).

## B. PLAINTIFF'S PRIMA FACIE CASE

■ In order for plaintiff to meet her initial burden of proof, she must show that (1) she was within a protected group; (2) she was qualified for the job; (3) she was rejected despite her qualifications; and (4) after her rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985); *see Hollander v. American Cyanamid Co.,* 895 F.2d 80, 83 (2d Cir.1990). Of course recognizing that various scenarios may give rise to a Title VII suit, the Supreme Court wisely acknowledged that the requisite elements of the *prima facie* case may also vary. *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6. Thus, in discharge cases, as opposed to failure to hire cases, courts have made certain substitutions. In discharge cases, the second element requires a showing that plaintiff was meeting the normal requirements of her work, *see Flowers v. Crouch–Walker Corp.,* 552 F.2d 1277, 1282

(7th Cir.1977), and the fourth element requires a showing that plaintiff was replaced by a member of a non-protected group. *See Powell v. Syracuse Univ.,* 580 F.2d 1150, 1156 (2d Cir.1978).

The requirement that plaintiff establish her *prima facie* case serves an important function in Title VII litigation: "it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. (cites omitted) As the Court explained in *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), the *prima facie* case 'raises an inference of discrimination only because we presume these acts if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' " *Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1094.

In the case at bar, the first and the third elements of plaintiff's *prima facie* case are not in dispute; plaintiff is clearly a member of a protected class, and she was discharged. Furthermore, the fourth factor is inapplicable to the instant case because all PTF's must first go through a probationary period, and if one is discharged, there is no so-called "replacement." Thus, this leaves plaintiff with only one remaining hurdle in order for her to establish her *prima facie* case. She must simply demonstrate the second factor of the *McDonnell Douglas* test—that her job performance was satisfactory.

■ In order for plaintiff to demonstrate satisfactory job performance, she "need not show perfect performance or even average performance." *Powell v. Syracuse University,* 580 F.2d 1150 at 1155 (1978) (quoting *Flowers,* 552 F.2d at 1283); *Davis v. New York City Health & Hosp. Corp.,* 640 F.Supp. 155, 159 (E.D.N.Y.1986). Plaintiff need only show that her performance was of "sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge" her. *Powell,* 580 F.2d at 1155.

■ In the case at bar, plaintiff has demonstrated satisfactory job performance. The evidence demonstrated that, although plaintiff had received unsatisfactory marks on her evaluation forms, she had performed to the

standards set by the Postal Service for new PTF's. Both the documentary and testimonial evidence demonstrated that in more than one instance, plaintiff performed as well as or better than her co-trainees on like tasks, but nevertheless received lower subjective ratings from her supervisors. Of particular importance in supporting this conclusion is the testimony of then-Postmaster Nealy. After being notified of plaintiff's consistent negative evaluations, Nealy took it upon himself to accompany plaintiff on her assigned route in order to personally evaluate plaintiff's performance. Nealy's conclusion, in unequivocal terms, was that plaintiff was qualified to deliver mail and in fact, did it "very well." This conclusion is further supported by the mail carriers who testified that plaintiff had performed her mail delivery duties satisfactorily.

Suffice it to say that plaintiff's casing abilities were also not markedly different from that of other new PTF's who were eventually hired by the Postal Service. This is evidenced by Nealy's testimony, both at the prior EEO hearing and in the instant trial, that he was not concerned about plaintiff's ability to case the mail.

"[P]roof of competence sufficient to make out a *prima facie* case of discrimination was never intended to encompass proof of superiority or flawless performance. If an employer is dissatisfied with the performance of an employee, he can properly raise the issue in rebuttal of the plaintiff's showing." *Powell,* 580 F.2d at 1155. In the context of this case, plaintiff has sufficiently demonstrated that she possessed the basic skills necessary for the performance of her job, and has thereby made out a *prima facie* showing of competence. Consequently, plaintiff has established all four elements of her *prima facie* case.

"The elements of proof in employment discrimination cases were not intended to be 'rigid, mechanized or ritualistic.'" *Meiri,* 759 F.2d at 996 (quoting *Furnco Constr. Corp.,* 438 U.S. at 577, 98 S.Ct. at 2949). Rather, they were intended to promote the general principle that plaintiffs in Title VII suits must merely raise an inference of discrimination. *Meiri,* 759 F.2d at 996; *see also*

*International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). Plaintiff's burden of proof at the *prima facie* stage of a Title VII case is *de minimis. See Meiri,* 759 F.2d at 996.

In short, plaintiff offered sufficient evidence to demonstrate her *prima facie* case, and thus, the court will now address the issue of whether the defendant satisfied its burden of rebuttal.

## C. POSTAL SERVICE'S REBUTTAL

Establishment of the *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. In order to rebut this presumption, the employer has the burden of producing evidence that the employee was discharged for a legitimate, nondiscriminatory reason. *Id.* The defendant, however, "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* (citing *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978)). The *Burdine* Court stated,

"[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted...."

*Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95.

The strength of the defendant's rebuttal, to a large extent, depends on the strength or weakness of plaintiff's *prima facie* case. *See Lieberman v. Gant,* 630 F.2d 60, 66–67 (2d Cir.1980) (noting relationship between the burden borne by the employee and the employer). In the case at bar, defendant's main proffered reason for plaintiff's discharge, in addition to her negative work performance, is

that plaintiff had a "negative attitude." As a matter of fact, Nealy explicitly cites this reason for plaintiff's termination in her notice of termination.[6] Nealy's conclusion was well supported by the evidence introduced at trial,[7] and the court finds it to be a valid nondiscriminatory reason for plaintiff's discharge.

As stated earlier, the defendant need not persuade the court that it was actually motivated by the proffered reason, but need only produce evidence that the employee was discharged for a legitimate, nondiscriminatory reason. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. Consequently, this Court finds that the defendant did in fact rebut plaintiff's presumption of discrimination.

The burden now falls back on the plaintiff to show that the proffered reason is a pretext and that unlawful discrimination was the real reason for her discharge.

### D. PRETEXT AND UNLAWFUL DISCRIMINATION

"After the employer articulates legitimate, non-discriminatory reasons for the employee's discharge, the employee must be afforded an opportunity to prove the existence of factual issues demonstrating that the stated reasons were merely a pretext for discrimination." *Meiri,* 759 F.2d at 997 (citing *Burdine,* 450 U.S. at 256–57, 101 S.Ct. at 1095). The employee may satisfy this burden by showing that the employer was motivated by a discriminatory reason or that the proffered reason given by the employer was false. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Recently, the Supreme Court in *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), heightened the plaintiff's burden in Title VII cases. It is now incumbent upon a plaintiff to prove not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge. *Id.* —— U.S. at ——, 113 S.Ct. at 2752.

Plaintiff in the case at bar has failed to meet the initial burden of falsity.

■ The evidence at trial clearly indicates that the plaintiff was treated differently from all the other PTF's. This conclusion, however, is of no moment unless plaintiff is able to establish that the proffered reason given by the defendant for the disparate treatment is merely pre-textual. *Meiri,* 759 F.2d at 997. This is where the plaintiff fails to carry her burden. Although plaintiff's counsel had done a commendable job in demonstrating that plaintiff was treated differently from all the other PTF's, there simply is not a scintilla of evidence which shows that the treatment was due to reasons other than plaintiff's attitude. To the contrary, there is ample evidence that plaintiff was confused, not aggressive enough, and failed to follow instructions when instructions were given. Plaintiff failed to refute any of these claims, and thus, failed to sustain her ultimate burden.

Furthermore, even assuming *arguendo* that plaintiff was able to establish pretext, her claim would nevertheless fail because she failed to show discriminatory intent on the part of the defendant.

A few comments are in order here. From the evidence, it is clear that supervisors Corcoran and Coleman were generally unsupportive of plaintiff. At best, Corcoran and Coleman were inhospitable to plaintiff, and clearly formed an early impression that she would not "fit in" at the Endicott post office. The degree to which that impression colored their evaluations of plaintiff cannot be doubted.

Plaintiff's direct supervisors are not the only contemptible actors here. It is equally clear that Postmaster Nealy was lacking in administrative responsibility. Notwithstanding plaintiff's understandable aversion to confronting the male trainee who uttered the vulgar remark, Nealy should have immediately taken action of his own initiative. Instead, he never spoke to the offender. Even

---

6. The letter of termination specifically stated that the plaintiff's deficiencies were "due to a number of factors, a primary one being [her] attitude, which has been cited as being less than positive on a number of occasions."

7. The evidence showed that the plaintiff was at times confused, not aggressive enough, and failed to follow directions.

more objectionable was Nealy's failure to ensure that plaintiff was given the necessary support in order to improve and succeed at her job. After learning of the supervisors' concerns regarding plaintiff's ability to perform her duties, Nealy not only failed to assist plaintiff, but indicated to Union Steward David Snyder that "no special efforts would be made for [her]."

If the court's ultimate determination of plaintiff's claims hinged on these factors alone, it cannot be gainsaid that she would prevail. Unfortunately however, despite plaintiff's counsel's attempts to show that plaintiff's negative evaluations were improper and disparately imparted, there was simply no proof offered to show that the criticisms and poor reviews had anything to do with the fact that plaintiff is a woman. As noted above, at least one of plaintiff's supervisors, as well as one of plaintiff's co-trainees, were women. There simply is no evidence to support plaintiff's contention that a gender-based motive formed the basis for her discharge. Accordingly, plaintiff has failed to demonstrate a viable claim for discriminatory discharge under Title VII.

## III. RETALIATION CLAIM

Section 702(a) of Title VII states, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e–3(a). "The objective of this subsection is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). A finding of unlawful retaliation, however, does not depend on the merits of the underlying discrimination complaint. *See Davis v. State Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986); *Sims v. Mme. Paulette Dry Cleaners,* 580 F.Supp. 593, 594 (S.D.N.Y.1984). The plaintiff must merely demonstrate " 'a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.' " *Manoharan,* 842 F.2d at 590 (citations omitted).

The *McDonnell Douglas/Burdine* evidentiary framework also governs the order of proof in retaliation cases. *See Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir. 1980). Under this framework, as previously stated, in order to shift the burden of production to the defendant so that the defendant may articulate some legitimate, non-retaliatory reason for the adverse employment action, the plaintiff must first establish her *prima facie* case. *See Grant,* 622 F.2d at 46; *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982). "To make out a *prima facie* case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action." *Manoharan,* 842 F.2d at 593 (citing *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987)).

Plaintiff has established the first element of her *prima facie* case. The Second Circuit has stated that in order "[t]o prove that [the plaintiff] engaged in protected activity, the plaintiff *need not* establish that the conduct [she] opposed was in fact a violation of Title VII." *Manoharan,* 842 F.2d at 593 (citing *Davis,* 802 F.2d at 642) (emphasis added). The plaintiff, however, must at a minimum demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Id.* (citing *Abel v. Bonfanti,* 625 F.Supp. 263, 267 (S.D.N.Y. 1985) and *Francoeur v. Corroon & Black Co.,* 552 F.Supp. 403, 412 (S.D.N.Y.1982)).

In the instant case, the court finds that plaintiff had a good faith, reasonable belief that the statement made by her co-trainee constituted an unlawful employment practice by the defendant. The immediate action taken by plaintiff supports such an inference. Further support for this conclusion can be found in the fact that Postmaster Nealy treated plaintiff's complaint as such, and also in the fact that he immediately expressed his opinion as to whether the

statement made by her co-trainee constituted sexual harassment. Accordingly, the court concludes that plaintiff's report of the incident constituted a "protected activity," and she has therefore demonstrated the first element of her *prima facie* case of retaliatory discharge.

As to the second element, there can be no doubt that the defendant was aware of plaintiff's activity. By complaining to her training supervisor about her co-trainee's offensive comment, her activity was necessarily brought to defendant's attention, and thus, plaintiff has successfully demonstrated the second element of her *prima facie* case. Likewise, since plaintiff's discharge was obviously an adverse employment action, plaintiff has also established the third element of her *prima facie* case. The plaintiff, however, has failed to establish the fourth element of causation; that is, she is not able to establish that her complaint about the offensive comment was causally related to the adverse employment decisions made against her.

■ To establish the requisite causal nexus between the protected activity and the adverse employment action, a plaintiff "must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Cohen,* 686 F.2d at 796; *see Devine v. Whelan,* No. 90 Civ. 6272, 1993 WL 350049 at *2 (S.D.N.Y. Sept. 3, 1993). A plaintiff may establish the necessary causal link directly by evidence of retaliatory animus or indirectly by demonstrating that the protected activity was followed closely in time by the adverse action, *Manoharan,* 842 F.2d at 593; *DeCintio,* 821 F.2d at 115; *Davis,* 802 F.2d at 642; *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 110 (1st Cir.1988), or by introducing evidence of disparate treatment of other employees engaging in similar conduct. *DeCintio,* 821 F.2d at 115 (citing *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1188–89 (11th Cir.), *cert. denied,* 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985)).

In the case at bar, since plaintiff was not able to produce any direct evidence of retaliatory animus, it was incumbent upon her to indirectly demonstrate the necessary causal link between the protected activity and the adverse action. This she failed to do.

Although the courts have stated that the time proximity between the protected activity and the adverse action of the employer may be a basis for drawing an inference of causation, *see, e.g., Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 202 (1st Cir.1987), courts will not hold an employer legally liable for discharging an employee when the evidence clearly shows that the employee was not performing her job satisfactorily. *See Valdez v. Mercy Hosp.,* 961 F.2d 1401, 1403 (8th Cir.1992). In other words, "Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies [and] unsatisfactory performance...." *Jackson v. Saint Joseph State Hosp.,* 840 F.2d 1387, 1391 (8th Cir.1988).

■ In the instant case, plaintiff has failed to establish causation. From the record, the court cannot conclude that the "protected actions" taken by plaintiff were a "but for" cause of the adverse treatment she later received from the defendant. Specifically, plaintiff failed to produce any evidence that the negative evaluations she received were the result of her "protected activity." As a matter of fact, of the two supervisors, Coleman and Corcoran, who evaluated plaintiff's performance and who also testified during trial, plaintiff could not even establish that Corcoran knew of the complaint made by plaintiff, and furthermore, could not establish that Coleman knew of the substantive content of the offensive statement. Thus, there is simply no evidence from which this court can draw an inference that the protected activity was the cause of the negative evaluations.

As to the discharge itself, there is ample evidence to support the conclusion that the discharge was not precipitated by the "protected act." The evidence demonstrates that plaintiff was unassertive and was at times quite confused about her tasks. The evidence further revealed that plaintiff failed to follow simple directions given by her supervisors. Moreover, Postmaster Nealy testified that her mail delivery and casing abilities were acceptable, but that it was her poor

attitude which caused her to receive negative evaluations. Nealy ultimately discharged plaintiff based on these evaluations. Plaintiff failed to show that the supervisors were influenced by plaintiff's protected act since one was not aware of the incident in question and the other not aware of the substantive content of the statement itself. From these facts, it is the court's conclusion that plaintiff failed to sustain her burden of establishing that she was effectively forced out of her job in retaliation for reporting the single incident during her training period. Thus, since causation was not shown, plaintiff has failed to sustain her burden with regard to her *prima facie* case of retaliatory discharge.

Finally, even if the court was to assume *arguendo* that plaintiff has shown her *prima facie* case of retaliatory discharge, her claim would nevertheless fail. This is because the defendant has proffered a legitimate, non-retaliatory reason for her discharge—her attitude—and because plaintiff has failed to submit any evidence to establish that the proffered reason was pre-textual. This analysis would mirror the analysis done under discriminatory discharge. *See supra.*

## IV. CONCLUSION

With respect to plaintiff's discriminatory discharge claim, the court concludes that although plaintiff was successful in demonstrating her *prima facie* case, the reasons offered by the defendant for terminating plaintiff were legitimate non-discriminatory reasons, and ultimately, plaintiff failed to offer evidence to prove that the reasons articulated by defendant's employees were pre-textual in nature. Accordingly, plaintiff's discriminatory discharge claim is dismissed.

With respect to her retaliatory discharge claim, the court concludes that plaintiff failed to make out a *prima facie* case. Even though plaintiff has demonstrated that she was engaged in a protected activity, that the defendant was aware of such activity, and that plaintiff suffered adverse employment decisions, plaintiff failed to establish a causal nexus between these events. Furthermore, even assuming *arguendo* that plaintiff made out a *prima facie* case of retaliatory discharge, the reasons offered by the defen-

dant's employees for terminating her were legitimate non-discriminatory reasons, and as with discriminatory discharge, plaintiff ultimately failed to offer evidence to prove that the reasons articulated by defendant's employees were pre-textual in nature. Accordingly, plaintiff's retaliatory claim under Title VII must also be dismissed.

The clerk of the court is hereby **ORDERED** to enter judgment in favor of the defendant on all claims and close the file.

**IT IS SO ORDERED.**